Appellant-defendant Jeffrey Stevens, appeals from his convictions on three counts of Aggravated Robbery, one count of Attempted Aggravated Murder, and one count of Aggravated Murder; all counts included a firearm specification and prior aggravated felony specification. Stevens contends that the trial court abused its discretion by denying his request for a continuance, shortly before trial, to seek exculpatory evidence from the State and from federal authorities; that the trial court erred by admitting evidence of his escape from jail while awaiting trial; that a photo spread shown to an eyewitness was unduly suggestive, and should have been suppressed; that evidence of his having nodded his head in response to police interrogation about the criminal acts should not have been admitted because his act was not knowing and voluntary, and was not indicative of an affirmative response to the questions; that the trial court erred by failing to give requested cautionary instructions concerning eyewitness testimony; that his trial counsel was constitutionally ineffective in having failed to procure the testimony of two witnesses at trial; that his trial counsel was constitutionally ineffective in having failed to file a notice of alibi within the required time; that the trial court abused its discretion in declining to allow a notice of alibi filed on the first day of trial; and that the trial court erred in denying his motion for a new trial because of prosecutorial misconduct; that the trial court erred in denying his motion for a new trial based upon newly-discovered evidence.
We conclude that the trial court did not abuse its discretion in denying Stevens's motion for a continuance, because the record does not indicate that there was any exculpatory evidence that Stevens could have obtained from the prosecutor or from federal authorities had he had more time; that the trial court did not err in admitting evidence of Stevens's escape from jail while awaiting trial, as evidence of flight from which the jury might infer guilt; that the photo spread shown to an eyewitness was not unduly suggestive; that the record indicates that Stevens's nodding his head during police interrogation was knowing and voluntary and permitted the jury to conclude that Stevens was responding affirmatively to the questions; that the trial court did not err in declining to give requested cautionary instructions concerning eyewitness testimony because the eyewitness testimony had sufficient indicia of trustworthiness; that Stevens's trial counsel has not been shown upon this record to have been constitutionally ineffective in having failed to procure the testimony of two witnesses at trial where he: (1) left a note on the front door of one witness asking her to contact him, and was told that she had no material testimony; and (2) subpoenaed the other witness, who appeared, but left before he could be called to testify; that Stevens's trial counsel has not been shown upon this record to have been constitutionally ineffective in having failed to file a notice of alibi within the required time where there is nothing in the record to establish that Stevens's trial counsel was aware of a potential alibi before the notice was filed; that the trial court did not abuse its discretion in declining to permit the filing of a notice of alibi on the first day of trial, where no list of alibi witnesses was proferred, and no good cause was shown for the delay in filing the notice of alibi; that the record fails to portray prosecutorial misconduct justifying Stevens's motion for a new trial; and that the record fails to portray that newly-discovered evidence, in the form of the testimony of a witness at the scene, was sufficiently material to produce a reasonable likelihood of a different result. Consequently, the judgment of the trial court is Affirmed.
 I
On February 3, 1996, James Brown, Brenden Fabian Byrdsong and Jay Washington were watching television with Billy Vance at Vance's home located at 952 Iola Avenue, Dayton, Ohio. According to the testimony of Byrdsong, all of the men were smoking marijuana; however, Brown testified that he was not. At some point, there was a knock on the door. When Jay Washington answered the door, two black males entered the residence. According to Byrdsong, Vance said "What's up Turtle?" to one of the men who entered the house. Brown testified that Vance said "What's up, Turtleman?". Stevens later informed the police that he was sometimes referred to by the nickname of "Turtle".
The two men pulled out guns, and one of them stated that this was a robbery. Vance, Byrdsong and Brown started to get their money out of their pockets, when they were ordered to get on the floor. The two armed men then said that they were going to kill them, and Vance, Byrdsong and Brown started begging for their lives.
After collecting the money from the men, one of the armed men put pillows on the heads of Byrdsong and Vance, and then tried to fire his gun. When it would not discharge, he took the other man's gun and fired it into the pillow on Vance's head. Brown jumped up, and began to wrestle with the gunman and his partner while Byrdsong ran out of the house. Brown then ran for the door, but was shot in the back. The assailants escaped.
James Townsend, Vance's brother, came over from next door. According to a report issued by Dayton Police Detective Terry Pearson, Townsend went into the house to check on his brother, who was still alive at that time. The report indicates that when Townsend asked who had shot him, Vance "replied something to the effect of DeWitt and Turtle." Townsend told Pearson that Vance died at that point.
After his arrival at the scene, Dayton Police Officer Welsh also attempted to ascertain the identity of the shooter. According to Welsh's report, Brown merely kept repeating "please don't let me die, I can't breathe." Therefore, Officer Welsh asked Townsend who had shot the victim; Townsend stated "Keith DeWitt is the one who shot them." Brown testified at trial that he had told Townsend that the person responsible was "Keith DeWitt's boy, Turtle." A broadcast was put out for Keith DeWitt, who was arrested.
Brown was transported to the hospital where he underwent surgery. He was permanently paralyzed by the wound. Two days after the shooting, Detective Pearson showed Brown three photo spreads. Brown was able to identify Stevens as the shooter, and he also was able to identify Andre Sinkfield as his partner. Brown also recognized DeWitt in one of the photo spreads, and informed Pearson that DeWitt had not been at the house.
Stevens was arrested and interviewed by Detective Pearson. In his testimony, Pearson described Stevens's confession as follows:
 A. He turned sideways in his chair. He had his head down like so [demonstrating], and I told him — I said, you know when we get into trial, J.B.'s going to identify you. He just shook his head `yes' [demonstrating].
 I said to him that we know that you did this. He sat there and shook his head `yes' and I said, you know you did this. He shook his head `yes' and that's when I said — why don't you tell me about it now, and he looked up at the ceiling and he said, I need to speak with an attorney. I can't cop out to this.
While in jail awaiting trial, Stevens assumed another prisoner's identity and escaped. He was subsequently arrested, while carrying a gun, and returned to jail.
Stevens was later indicted for escape under a different case number.
Stevens filed motions to suppress evidence of the interview with Detective Pearson as well as the photographic identification by Brown. After a hearing, the trial court denied the motions.
Early on in the case, defense counsel developed a theory that Keith DeWitt was the shooter and that the accomplice was Andre Sinkfield. Therefore, defense counsel issued subpoenas upon the United States Department of Justice, Federal Bureau of Investigation and the Drug Enforcement Administration for the production of the following information relating to Keith DeWitt:
 Any and all information in your files relating to Keith DeWitt and the shooting of Keith DeWitt which occurred on or about September 13, 1996; Keith DeWitt and the shooting of Billy Vance which occurred February 3, 1996; Keith DeWitt and the shooting of Jay Washington which occurred May 12, 1996.
The federal agencies filed motions to quash the subpoenas citing Stevens's failure to comply with Title 28, Code of Federal Regulations, § 16.21, et seq., which regulates the procedure to utilize when seeking the release of such federal records.
On October 1, 1996, Stevens filed a motion for continuance. In the motion, defense counsel stated that a continuance was necessary because counsel had not been provided discovery regarding Keith DeWitt. The motion further stated that a continuance was necessary because counsel had not been able to fully investigate the evidence regarding the escape charge filed against Stevens. Stevens also filed a response to the motion to quash the subpoenas to the FBI and the DEA, in which he claimed that DeWitt "is believed to be known by the [FBI and DEA], and local law enforcement agencies * * * to be the defacto leader of a group of men engaged in a pattern of criminal activity." The response further claimed that the "information will assist defense counsel in proving the innocence of their client." The motion to quash was granted by the trial court.
A hearing on the motion for continuance was held October 2. At the hearing, defense counsel stated that counsel were searching for exculpatory evidence, and made the following argument in support of the requested continuance:
 * * * Keith Dewitt's presence in this case is pervasive. It's in everything. We are aware of investigations that involve Mr. Dewitt by federal authorities as well as local authorities. We have not been able to access that information. The Court has asked us to make a statement of fact as to what we think is in there.
 Judge, that's impossible. We don't know. We do believe that there is going to be evidence, however, at least of a general nature, that goes into what Mr. Dewitt's criminal activity is that we believe relates specifically — that will relate specifically to this case as it relates to his associates, as it relates to his criminal activity, and as it relates to potential motives for the homicide in the Billy Vance case. The facts in this case as it relates to Mr. Vance indicate that this was an execution, and we think that there is information that is relevant to the defense and we think that there are a number of ways that this situation can be dealt with.
The trial court entered an order denying the request for a continuance on October 3, 1996. However, the court also ordered that any material contained in any federal investigative files be turned over to the defense in sufficient time to make appropriate use of it in compliance with the requirements of Brady v.Maryland, (1963), 373 U.S. 83. Also on October 3, pursuant toBrady, the defense filed a motion to compel the State to provide any such federal information.
On the scheduled trial date, October 7, the court specifically asked the State whether it had provided any Brady
material contained in the federal investigative material. The prosecutor informed the court that he had been assured through conversations with two U.S. Attorneys that the federal investigative files contained no material that was subject to disclosure pursuant to Brady. The prosecutor also stated that representatives of the FBI and the DEA corroborated this. The defense then repeated its request to be allowed to review the federal files, or in the alternative, that the trial court conduct an in-camera review of them. The trial court denied the request, and reset the trial to begin the following day.
Stevens was convicted on all counts on October 11, 1996, and was sentenced accordingly. On October 25, 1996, Stevens, pro se, filed a motion for a mistrial. On November 26, 1996, defense counsel filed a motion for a new trial. On February 10, 1997, defense counsel filed another motion for a new trial based on newly discovered evidence. The trial court held a hearing on April 1, 1997, and denied the motions. This appeal followed.
 II
Stevens's First Assignment of Error states:
 THE TRIAL COURT COMMITED [SIC] PREJUDICIAL ERROR IN OVERRULING APPELLANT'S MOTION FOR A CONTINUANCE AS APPELLANT'S COUNSEL DEMONSTRATED THE NEED FOR ADDITIONAL TIME TO OBTAIN ESSENTIAL INFORMATION COLLECTED BY FEDERAL AGENCIES CONCERNING KEITH DEWITT, ANOTHER SUSPECT IN THE CASE WHO WAS INVOLVED IN OTHER EXECUTION STYLE MURDERS AND WAS INITIALLY IDENTIFIED AS THE SHOOTER IN THIS CASE.
Stevens contends that the trial court abused its discretion by denying his motion for a continuance of the scheduled trial date.
In State v. Rash (1996), 111 Ohio App.3d 351, 354, we have held that the grant or denial of a motion of continuance is "a matter best left to the discretion of the trial court." In that opinion, we further held:
 Unless a defendant can show that the trial court abused its discretion, meaning that the trial court committed more than an error of law or judgment and that the attitude of the trial court was, in fact, unreasonable, arbitrary, or unconscionable, a reviewing court will not reverse the denial of a motion for a continuance. Ungar v. Sarafite (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 931; State v. Powell (1990), 49 Ohio St.3d 255, 259, 552 N.E.2d 191, 196-197; State v. Unger (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080. In Ungar, the United States Supreme Court wrote:
 "The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is made." (Emphasis added and citations omitted.) Ungar at 589, 84 S.Ct. at 849-850, 11 L.Ed.2d at 931.
 The Ohio Supreme Court has adopted and followed a balancing test from Unger that requires a "reviewing court to weigh potential prejudice against `a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" Powell, 49 Ohio St.3d at 259, 552 N.E.2d at 196, citing Unger, 67 Ohio St.2d at 67, 21 O.O.2d at 43, 423 N.E.2d at 1080. In Powell, the Supreme Court listed relevant factors to be considered: (1) length of delay sought, (2) previous continuances sought or granted, (3) inconvenience to all involved, (4) legitimacy of reason for delay, and (5) whether the defendant had caused the delay. Id.
Id.
When we consider the relevant factors, we note that the defense did not indicate what the potential delay might have been had the continuance been granted. We further note that the defense had previously sought a continuance of the trial date.[1] On the other hand, the record does not suggest that a continuance would have unduly inconvenienced the state, the prosecutors, or the court. Furthermore, while we conclude that defense counsel caused the delay by failing to request this information earlier, and by failing to comply with the federal regulations for obtaining such information, we decline to weigh this factor against Stevens. See State v. Rash, supra (trial counsel's misjudgment of time in which to have witnesses present for trial should not be held against defendant).
Of more importance to this case, we conclude that the reason for requesting the delay was questionable. There is no indication that the State relied upon any federal investigative files in presenting its case against Stevens. Moreover, despite the fact that the records sought were compiled by a separate sovereign, the United States of America, and were not in the State of Ohio's possession, Stevens successfully sought to compel the prosecutor to provide the requested information. Given the prosecutor's assertion that the federal agencies did not possess any exculpatory evidence, we believe that the State satisfied its constitutional disclosure obligations, and we conclude that Stevens was provided with all information to which he was entitled. Stevens has cited no authority, nor have we found any, to lead us to conclude that a criminal defendant or state court is entitled to personally search federal files in the absence of a proper request for such records and in light of the proper assurances by the authorities that no Brady material exists in those records. Thus, we cannot discern any reason for granting a continuance.
Accordingly, the First Assignment of Error is overruled.
 III
Stevens's Second Assignment of Error is as follows:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN PERMITTING TESTIMONY OF AN ALLEGED ESCAPE ATTEMPT BY APPELLANT SINCE THE ALLEGED ESCAPE ATTEMPT OCCURRED MORE THAN SEVEN MONTHS AFTER THE CRIME FOR WHICH APPELLANT WAS CHARGED AND HAD NO BEARING ON THE INNOCENCE OR GUILT OF THE APPELLANT CONCERNING THE CHARGES FOR WHICH HE WAS BEING TRIED.
Stevens contends that the trial court erred by permitting the State to introduce evidence that he escaped from the Montgomery County Jail while awaiting trial. In support, he argues that the alleged escape constitutes evidence of "other crimes, wrongs or acts" and is "not admissible for any legitimate purpose listed in Evid.R. 404(B)." He also cites State v. Tubbs (Feb. 25, 1994), Mahoning App. No. 92 C.A. 45, unreported, for the proposition that such evidence is inadmissible because it is not "closely related in nature, time and place to the offense charged." Finally, he argues that permitting the jury to consider this evidence violates his right to due process, his Sixth Amendment right to counsel, and his right to be free from a "double jeopardy situation".
Evid.R. 404(B), which governs the admissibility of "other acts" evidence, reads as follows:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
We find no merit in Stevens's argument that the escape evidence is inadmissible simply because it is not specifically mentioned in the list of "legitimate" admission purposes contained in Evid.R. 404(B). The use of the phrase "such as" in Evid.R. 404(B) indicates that the list of purposes for which other acts evidence is admissible is not exhaustive, and does not act to limit the legitimate reasons for which other acts evidence may be introduced. See State v. Wilson (1982), 8 Ohio App.3d 216, 219
("a party may sometimes introduce `other acts' evidence, although the purpose for its admission is not enumerated in Evid.R. 404(B)").
Furthermore, we note that it has been "universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." State v. Strub (1975), 48 Ohio App.2d 57,64; State v. Whitley (1969), 17 Ohio App.2d 159, 162;State v. Cron (1967), 14 Ohio App.2d 76, 86. Although all of the above cases involve flight rather than escape from jail, we believe the reasoning in those cases is applicable to the case herein.
Stevens was lodged in jail awaiting trial on charges of Aggravated Robbery and Aggravated Murder stemming solely from the events of February 3, 1996. He was not serving a jail sentence for any other crime, nor was he awaiting trial for any other criminal activity. Therefore, we conclude that a jury could reasonably infer that his escape was motivated by a desire to avoid prosecution and by consciousness of guilt.[2]
Our holding is in accord with Dull v. State (1930), 36 Ohio App. 195, which is similar to the facts in this case. While in jail awaiting trial for murder, Dull attempted to escape. The trial court permitted the sheriff to testify about the attempted escape. In upholding the trial court's decision, the Third District Court of Appeals stated as follows:
 The attempts of the accused to escape while confined in jail may be shown as circumstances proper to be considered, and to be given such weight as they are fairly entitled to, with the other evidence, in determining the guilt or innocence of the accused.
Dull, at 196-197, citation omitted.
We next turn to Stevens's argument that the evidence of escape must be suppressed because it occurred so many months after the commission of the criminal activity. In support, Stevens relies upon the holding of the Seventh District Court of Appeals in State v. Tubbs, supra. In Tubbs, the Seventh District Court of Appeals indicated that an instruction on flight from apprehension as evidence of consciousness of guilt would be inappropriate because the defendant was arrested five weeks after the alleged crime in "an entirely separate location." The court stated that the evidence of flight could not support an inference of guilt because it was too far removed in time and place. Id. However, we note that Tubbs is not a reported case. Moreover the portion of the case upon which Stevens relies is dictum. Furthermore,Tubbs deals with the propriety of a jury instruction rather than the admissibility of evidence.
Stevens's argument essentially urges us to establish a rule whereby evidence of escape cannot be offered against an inmate who simply does not decide to, or is unable to, effectuate an escape for a period of months. We decline to do so.
We next address Stevens's claims that the admission of the escape evidence "created a double jeopardy situation", and violated his due process rights. We reject the double jeopardy argument because the record does not reflect that Stevens had been tried on the charge of escape; thus, not even the specter of a double jeopardy claim has been raised. Likewise, we reject the claimed violation of Stevens's right to due process, which appears to be premised upon his insistence that the escape was an "alleged and unrelated" crime. The mere fact that Stevens believes the escape to be unrelated or unproven does not raise a due process issue.
Finally, Stevens's argument that the admission of the escape evidence violated his Sixth Amendment right to counsel must fail. Stevens claims that his counsel was unable to adequately defend him against the escape evidence because counsel were not representing him on the escape charge, and thus were not "privy to the facts and circumstances of the alleged escape." However, a review of the transcript belies this claim — it reveals that defense counsel conducted a meaningful cross-examination of the State's main witness regarding the escape. Furthermore, the record reveals that Stevens personally contacted other private counsel to represent him in regard to the escape charge. Thus, it would appear that the inability, if any, of trial counsel to defend him was hampered, if it was hampered at all, by Stevens's decision to retain separate counsel, rather than as a result of actions of the trial court or the State.
Having reviewed the record, we cannot say that the trial court erred by admitting the escape evidence. Accordingly, Stevens's Second Assignment of Error is overruled.
 IV
Stevens's Third Assignment of Error states:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DENYING APPELLANT'S MOTIONS TO SUPPRESS IDENTIFICATION EVIDENCE AND REPORTED "ADMISSIONS" MADE VIA THE NODDING OF HIS HEAD DURING AN INTERROGATION.
In his Third Assignment of Error, Stevens argues that the trial court erred by failing to suppress evidence regarding James Brown's pretrial photographic identification of him, as well as the non-verbal admissions made by him during interviews conducted after his arrest.
We begin with the issue of the pre-trial photographic identification. Stevens contends that the photographic array presented to James Brown was unduly suggestive. This argument appears to hinge on his claim that he has a distinguishing feature in the form of a "lazy eye." He argues that the police "made no mention of attempting to obtain other photos with similar characteristics of an eye abnormality," and that this characteristic could have brought undue attention to Stevens's photo.
In State v. White (Feb. 2, 1994), Clark App. No. 3057, unreported, we addressed the issue of suggestive photographic confrontations:
 In many cases, and in almost all cases in which the criminal offender is not known to his victim or other eyewitnesses and is not arrested at the time of the crime, those who witness the crime are asked to identify the perpetrator for purposes of police investigation through some form of confrontation. This confrontation may be in the form of a "lineup", a one-on-one "show up", or from a photograph or series of photographs displayed to the witness. When any of these systems of confrontation suggest, due to the manner or mode of their presentation, that one individual is more likely than others to be the perpetrator of the crime, that fact increases the likelihood of misidentification and violates the right to due process of law of a defendant so identified. Identification testimony that has been tainted by an unduly or unnecessarily suggestive out-of-court confrontation may be suppressed on that basis.
 However, even when a confrontation is unnecessarily or unduly suggestive, the identification testimony derived from the confrontation is not inadmissible solely for that reason. Reliability of the testimony is the linchpin in determining its admissibility. So long as the identification possesses sufficient aspects of reliability, there is no violation of due process.
 Reliability is determined from the totality of the circumstances. These circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
 The foregoing due process concerns are implicated only if and when a confrontation is unnecessarily or unduly suggestive. That prospect usually arises when the witness has been shown but one subject, whether in a "showup" * * * or a single photograph * * *. Similarly, if the witness is shown pictures or photographs of several persons in which the photograph of one recurs or is in some way emphasized, undue suggestion may occur. However, even when the confrontation process is unduly or unnecessarily suggestive, the later identification testimony should not be excluded so long as the identification itself is reliable.
Id., citations omitted.
Although Stevens argues that the photo array was unduly suggestive because of his "lazy eye," we have viewed the photo spreads and cannot reach the same conclusion. Two days after the murder and shooting occurred, James Brown picked Stevens out of a photo array consisting of three sets of photographs, each of which consisted of pictures of six different men with no apparent duplication between the different arrays. All of the men were black, and all appear to be of similar age. Furthermore, any suggestion in the photograph that Stevens has a lazy eye is slight; in fact, based upon Stevens's description of himself as having a "lazy eye," this panel was compelled to conclude that at least two of the other men pictured could reasonably be thought, based upon their photographs, to have the same condition.
Moreover, even if we were to find that the picture was suggestive, we must conclude that the identification itself was reliable. Within a matter of seconds, James Brown was able to identify Stevens as the man who shot and killed Billy Vance, and as the person with whom Brown struggled in an effort to gain control of the gun. He also was able to identify Andre Sinkfield as the other person who was with Stevens. He readily identified Keith DeWitt in one of the photos and stated that he was not present at the time the crimes occurred. Furthermore, he was positive of his identification both from the photo array, and at trial. His identification was based on having had the unfortunate opportunity to observe Stevens over several minutes at close range.
Based upon the totality of the circumstances, we cannot say that the trial court erred by permitting the State to introduce evidence of Brown's pre-trial identification of Stevens.
We next turn to the issue of the non-verbal admission. Stevens contends that his waiver of his right to remain silent was not knowing and voluntary because "there is nothing to indicate that [he] understood that [nodding his head] could be contrived and presented as an admission of guilt," and because "it is likely that he understood the `right to remain silent' as being applicable to nodding of the head."
"Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues. However, both are measured by the `totality of the circumstances' standard." State v. Eley (1996), 77 Ohio St.3d 174,178. "Evidence of police coercion or overreaching is necessary for a finding of involuntariness * * *." Id. In this case, there is no evidence that the police threatened or physically abused Stevens. The interview, which included two breaks of twenty or thirty minutes, lasted from 2:45 p.m. until 6:15 p.m., and thus, was not unduly lengthy. There is no evidence that Stevens was deprived of food or drink during the interview. In sum, there is no evidence in the record that the police coerced Stevens into making a statement.
The record also supports a finding that Stevens's waiver of his rights was knowing and intelligent. The transcript of the hearing on the motion to suppress reveals that Detective Pearson informed Stevens of his Miranda rights. According to his testimony, Detective Pearson asked Stevens whether he understood his rights; Stevens indicated that he did. Moreover, Stevens waived his rights in writing as follows:
 The above statement of rights has been read to me. I understand what my rights are. I am willing to make a statement and answer questions. I do not have a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.[3]
"Evidence of a written waiver form signed by the accused is strong proof that the waiver is valid." Eley, supra.
Moreover, we find Stevens's claim that he did not realize that nodding his head could be construed as an admission of guilt to hold no merit. There were no other criminal suspects being questioned in the same room as Stevens. Detective Pearson asked Stevens three separate questions, each of which he affirmatively responded to by nodding his head "yes." We conclude that any person of average intelligence would realize that nodding one's head negatively or affirmatively after being asked direct questions could be construed as giving an answer[4]. Accordingly, we find that Stevens's admissions were made knowingly, voluntarily and intelligently[5].
Stevens's Third Assignment of Error is overruled.
 V
Stevens's Fourth Assignment of Error is as follows:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN NOT GIVING APPELLANT'S PROPOSED JURY INSTRUCTION OR THE STANDARD OHIO JURY INSTRUCTION RELATING TO EYE-WITNESS IDENTIFICATION IN THE CHARGE TO THE JURY.
Stevens contends that the trial court erred by failing to utilize his requested jury instruction, or alternatively the standard Ohio Jury Instruction, regarding eye-witness identification.
In criminal cases, if requested special instructions are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge. State v. Guster (1981),66 Ohio St.2d 266, 269. Here, no issue has been raised regarding the correctness or timeliness of the requested instruction, therefore, our inquiry must focus on whether the proposed instruction was pertinent to the case.
We find Guster, supra, dispositive. In Guster, an off-duty police officer was shot while working as a security guard at a hospital. Id., at 266. The shooting occurred in a brightly illuminated corridor, when the officer was approximately four and half to five feet from the defendant. The officer had approximately ten seconds to observe the gunman prior to the shooting, and was able to observe him for at least ten seconds after. Id. The officer was able to give a description of the gunman shortly after the incident, and the following day was able to provide details from which a composite picture was sketched.Id., at 267. Two days later, the officer began searching photographs and mug books, but was not able to select a picture until approximately twelve to thirteen days later. Id. Two months later, the officer picked the gunman out of a lineup, and was also able to make an in-court identification at trial. Id. No other evidence corroborated the officer's identification of the gunman. Id. Based upon the factual circumstances in Guster, the Supreme Court held that "those infirmities said to attach to eyewitness identification necessitating a cautionary instruction are largely or wholly absent under the facts of this case." Id., at 272.
In the case before us, the evidence shows that Brown had the opportunity to observe Stevens for a period of several minutes from a short distance, and even had a short physical struggle with him. The evidence shows that the lights were on in the house at the time. Thus, the "physical circumstances surrounding his observation were optimum, and the intervals of observation were sufficient for accurate perception and memory recall." Guster, at 272. Brown's subsequent photographic identification of Stevens, which took place two days later, was "both immediate and without equivocation." Id.
We also note that Byrdsong was able to identify Stevens at trial based upon his prior photographic identification of him. There is no indication in the record that Stevens ever challenged the reliability of Byrdsong's identification of him.
We conclude that the facts in this case did not necessitate the use of the requested instruction, and that the trial court did not abuse its discretion by failing to utilize either Stevens's proposed instruction or the standard instruction contained in OJI concerning eye-witness identification. Accordingly, Stevens's Fourth Assignment of Error is overruled.
 VI
Stevens's Fifth Assignment of Error states as follows:
 THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE REPRESENTATION BY COUNSEL BY VIRTUE OF THE PUBLIC DEFENDERS FAILURE TO: A) ADEQUATELY INVESTIGATE AND PROCURE MATERIAL WITNESSES FOR TRIAL TO SUPPORT THE IDENTIFICATION OF ANOTHER SUSPECT; AND B) PROVIDE TIMELY NOTICE OF APPELLANT'S ALIBI; AND C) PRESENT WITNESSES AT TRIAL PROVING SUCH ALIBI.
Stevens's makes a two-part argument in support of his claim that he was denied the effective assistance of counsel. First, he claims that defense counsel failed to make contact with a witness, Teresa Jackson, and failed to "pursue obtaining James Townsend to testify at trial." According to Stevens, he was prejudiced by the failure to secure these witnesses because their testimony would have "substantiated the naming of Keith DeWitt as the identified shooter." Second, Stevens argues that defense counsel failed to file a notice of alibi until the first day of trial. He contends that the untimely filing prejudiced him because it caused the trial court to exclude testimony that could have exonerated him.
The standard for determining whether defense counsel's representation was ineffective was set by the United States Supreme Court In Strickland v. Washington (1984), 466 U.S. 668. This standard, utilized in Ohio, requires that a defendant satisfy a two-part test. State v. Bradley (1989), 42 Ohio St.3d 136. First, the defendant must demonstrate that his counsel's representation was deficient by showing that counsel's performance fell below an objective standard of reasonable representation.Id., at paragraph two of the syllabus. Second, the defendant must prove that his trial counsel's deficient representation resulted in prejudice to the defendant. Id. To prove prejudice, the defendant must show "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id., at paragraph three of the syllabus.
A "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *". Strickland, supra, at 689. Under Ohio law, a properly licensed attorney is presumed competent. State v. Estes
(March 1, 1996), Montgomery App. No. 15311, unreported, followingVaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301.
We turn first to the issue of Ms. Jackson's testimony. After his conviction, Stevens submitted an affidavit from Ms. Jackson [attached as an exhibit to his motion for a new trial] wherein Ms. Jackson averred that on February 3, 1996, she "saw a man laying on the ground outside of the house next door." The affidavit further averred that "[t]he man on the ground was saying `Keith DeWitt' in response to questions about who caused the incident that had just occurred."
However, the record indicates that, prior to trial, the only information that defense counsel possessed regarding Ms. Jackson was a police report generated after the incident, which was provided to the defense during discovery. According to that report, Ms. Jackson was interviewed by the police after the incident, and she stated that "she heard dogs barking and a car door slam, but did not hear any gunshots, and did not see anyone."
According to the testimony of defense counsel during the hearing on the motion for a new trial, he and his investigators actually went to Ms. Jackson's home and left a message on the door requesting her to contact them. He also testified that he made two other attempts to contact her, and that the investigators made at least one other attempt. He testified that it was not until after trial that he succeeded in contacting Ms. Jackson.
Given that the only information available to defense counsel prior to trial regarding Ms. Jackson indicated that she did not hear or see anything related to the incident, and given that defense counsel still attempted to contact her, we cannot say that counsel acted unreasonably.
We next address the issue of defense counsel's failure to secure the testimony of James Townsend. According to the record, Mr. Townsend appeared for trial pursuant to a defense subpoena. However, at the time he appeared, the State had not rested its case. Apparently Mr. Townsend then left. Defense counsel sent an investigator out to attempt to serve Mr. Townsend for the next day, but Mr. Townsend did not appear. According to Stevens, Townsend would have testified that Billy Vance made a dying declaration naming Keith DeWitt as the shooter.
"The mere failure to subpoena witnesses is not a substantial violation of an essential duty to a client in the absence of a showing that the testimony of any one or more of the witnesses would have assisted the defense." Middletown v. Allen (1989),63 Ohio App.3d 443, 448, citations omitted. In this case, defense counsel did not fail to subpoena Townsend. To the contrary he was subpoenaed, and he appeared. We cannot tell from the record whether defense counsel permitted him to leave the courthouse on the day he appeared, or whether he merely decided to leave without permission. Furthermore, the record does not reveal whether Townsend was in fact served with a subpoena to appear for trial the next day and merely failed to appear, or whether defense counsel was unable to serve another subpoena upon him. Based upon the state of the record before us, we cannot say that the failure to present Townsend's testimony at trial was the result of ineffective assistance of counsel.
Finally, we turn to the issue of the untimely filing of the notice of an alibi defense. The record does show that the notice was untimely filed on the first day of trial, and that the trial court excluded any alibi evidence. However, as the State notes, "there is simply nothing in the record to indicate either when or under what circumstances counsel became aware of any potential alibi witnesses for [Stevens]." Therefore, we cannot determine, based upon this record, whether the failure to timely file the notice of alibi constituted ineffective assistance of counsel.
Because the record does not support a finding that counsel's representation was ineffective, Stevens's Fifth Assignment of Error is overruled.
 VII
Steven's Sixth Assignment of Error reads as follows:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN REFUSING TO PERMIT: A) THE UNTIMELY FILING OF THE NOTICE OF ALIBI; AND B) THE PRESENTATION OF ALIBI TESTIMONY ON THE GROUNDS THAT THE APPELLEE [SIC] HAD FAILED TO COMPLY WITH CRIM.R. 12.1 AS THIS VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
Stevens contends that the trial court abused its discretion by excluding alibi evidence pursuant to Crim.R. 12.1. He cites no authority for this proposition, but merely argues that under the "totality of circumstances and in the interest of justice" and fairness, he should have been permitted to present alibi evidence despite the untimely filing of the notice.
Crim.R. 12.1 provides, in part, as follows:
 Whenever a defendant in a criminal case proposes to offer testimony to establish an alibi on his behalf, he shall, not less than seven days before trial, file and serve upon the prosecuting attorney a notice in writing of his intention to claim alibi. * * * If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant for the purpose of proving such alibi, unless the court determines that in the interest of justice such evidence should be admitted.
The Ohio Supreme Court has held that this rule "should be construed liberally and not be applied where no prejudice would accrue to the prosecution, where there is a demonstrable and excusable showing of mere negligence, or where there is good cause shown." State v. Smith (1985), 17 Ohio St.3d 98, paragraph two of the syllabus. In Smith, the defense did not give any notice of its intent to present alibi evidence until after the State had rested its portion of the case, and thus, the trial court excluded the evidence. Id., at 99. In upholding the decision of the trial court, the Supreme Court relied upon the fact that the prosecution was "unaware of the identity of the alibi witnesses, had no opportunity or motive to question these witnesses or to investigate the facts, and would have suffered prejudice by the introduction of alibi testimony." Id., at 104.
Here, the notice of alibi was clearly filed untimely. The defense waited until the first day of trial to file the notice. Additionally, no list of potential alibi witnesses was provided with the notice. The prosecution was unaware of the alibi and the potential witnesses, and had no opportunity to investigate the claim. Furthermore, no reason was given for the late filing; thus, absolutely no showing of excusable neglect or good cause was made. Therefore, we cannot say that the trial court abused its discretion by excluding the evidence of alibi.
Stevens's Sixth Assignment of Error is overruled.
 VIII
Stevens's cites the following as his Seventh Assignment of Error:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DENYING THE APPELLANT'S MOTION FOR A MISTRIAL OR A NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE THAT WAS NOT DISCLOSED IN ACCORDANCE WITH BRADY V. MARYLAND.
Stevens contends that the trial court abused its discretion by denying his two motions for new trial.
Stevens filed motions for new trial pursuant to Crim.R. 33(A)(2) and(6), which allow a trial court to grant a new trial based upon prosecutorial misconduct and newly discovered evidence. The motions were grounded upon Stevens's claim that Teresa Jackson overheard James Brown name Keith DeWitt as the shooter. Stevens contends that the State knew about this statement, yet it failed to make the defense aware of this exculpatory evidence. He further contends that Jackson's testimony constituted new evidence that could not have been discovered with reasonable diligence prior to trial.
At the hearing on the motion for new trial, Jackson testified that, on the night of the shooting, she observed an officer checking her car for fingerprints. She testified that she then was placed in a police cruiser where she informed an officer that she had heard dogs barking, and a car door slam. She testified that she told the officer that she had heard James Brown say the name "Keith DeWitt" while he was lying on the porch. She admitted that Brown may have said "Keith DeWitt" and "them" or "boys," but that she did not hear anything else that was said. She testified that she also informed the prosecutor's office of this statement. Jackson admitted that when she talked to Vance's mother later in the month after the shooting, she only told the mother that she had heard dogs barking.
The prosecutor testified that he had subpoenaed Ms. Jackson to testify in the case. He testified that he spoke to Ms. Jackson by telephone prior to trial because she was wondering why she had to appear when she knew nothing. He further testified that Jackson did not tell him anything about Keith DeWitt's name being mentioned. Based upon her purported inability to testify to anything substantive, Jackson was released from the State's subpoena.
Officer Michael Pauley testified that when he arrived on the scene, he was told to canvass the neighborhood to talk to potential witnesses. He stated that he went to Jackson's house first, which was right next door to where the shooting occurred. He testified that he interviewed Ms. Jackson on her porch after the shooting, and that she was never placed in his cruiser. Officer Pauley further testified that Jackson informed him only that she heard dogs and a car door, and that he put her statement in his report which he dictated four hours after speaking to her. He finally testified that if she had given him the name of a suspect, he would have had her fill out a written statement.
A claim of prosecutorial misconduct made in conjunction with a claim of newly discovered evidence filed pursuant to Crim.R. 33(A)(2) and (6) is properly reviewed under a due process analysis to determine whether the misconduct materially affected the defendant's substantial rights so that he was denied a fair trial.State v. Johnston (1988), 39 Ohio St.3d 48, 59. However, before the due process analysis is undertaken, the trial court must determine whether the claim of prosecutorial misconduct is valid. In its decision and entry denying the motions, the trial court found that the evidence did not support a finding that the prosecutor had failed to comply with relevant discovery requirements. After reviewing the record, and noting that the credibility of witnesses is a determination best left to the trier of fact, we cannot say that the trial court's finding was erroneous. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Thus, we conclude that the trial court did not abuse its discretion by denying Stevens's motion for new trial based upon his claim of prosecutorial misconduct.
We must also address the newly discovered evidence claim. "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." State v. Seiber (1990), 56 Ohio St.3d 4, 17, quoting State v. Petro (1947), 148 Ohio St. 473. "Granting or denying a new trial on the basis of newly discovered evidence rests within the competence and discretion of the trial judge", and absent a clear showing of such an abuse of discretion, the judgement of the trial court will not be disturbed. Seiber, at 17.
Stevens contends that Jackson's testimony would have directly refuted Brown's testimony that Stevens was the shooter. We cannot agree. Testimony was introduced at trial that Brown stated that the shooter was "Keith DeWitt's boy, Turtle." Our review of Jackson's testimony indicates that she would only have been able to testify that she overheard Brown mention DeWitt's name. This would tend to corroborate Brown's testimony. Furthermore, contrary to Stevens's claim, Jackson did not identify DeWitt as the shooter. Thus, her testimony would not refute Brown's testimony that Stevens was the shooter. Based upon these facts, and given that Stevens was positively identified as the shooter, we cannot conclude that there was a strong possibility that Jackson's testimony would lead to a different trial result. Accordingly, we conclude that the trial court did not abuse its discretion by denying Stevens's motion for new trial based upon his claim of newly discovered evidence.
Stevens's Seventh Assignment of Error is overruled.
 IX
All of Stevens's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN, and WOLFF, JJ., concur.
Copies mailed to:
George A. Katchmer
Kimberly K. Harshbarger
Hon. Jeffrey Froelich
[1] Stevens claims that he made one request for a continuance by motion dated October 1. However, our review of the record contradicts this assertion. Instead, we note that in a decision entry denying defense counsel's motion to withdraw as Stevens's attorney, the trial court stated that an oral motion for continuance of the October 7 trial date had been made by defense counsel at a conference held with the attorneys. This decision, filed on September 18, 1996, denied the oral motion.
[2] Stevens argues that "[s]ince the alleged escape occurred more than seven months after the crimes for which [he] was charged, his motive for the alleged escape could just as easily have been a loss of confidence in the legal system as opposed to a demonstration of guilt." Clearly, Stevens was free to advance this theory to the jury. However, the mere fact that an escape could be construed as something other than consciousness of guilt does not preclude its admission in evidence.
[3] The waiver also indicated in Stevens's own writing that he had completed eleven years of school and had obtained his GED.
[4] Stevens argues that by nodding his head he could have merely intended to indicate that another person might believe him to be guilty, and did not, as the State contends, intend to admit to the crime. Certainly, he was free to advance this explanation to the jury at trial. However, this alternative theory does not require the exclusion of the evidence. Rather, it creates a question of fact for the jury to decide.
[5] In support of our holding today, we note that the First District Court of Appeals has held that the affirmative nodding of a criminal suspect's head is admissible as a nonverbal assertion, or statement, which constitutes a nonhearsay party admission under Evid.R. 801(A)(2) and 801(D)(2)(a). See State v.Clark (Sept. 8, 1993), Hamilton App. No. C-920603, unreported.