OPINION
{¶ 1} Petitioner-appellant Christopher Lee Bennett appeals from the November 4, 2004, Judgment Entry of the Stark County Court of Common Pleas which denied appellant's motions to withdraw his guilty plea and for postconviction relief. Respondent-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On July 10, 2001, the Stark County Grand Jury indicted appellant on one count of aggravated vehicular homicide, one count of aggravated vehicular assault, one count of driving under the influence and one count of driving under suspension. Generally, the charges arose from a one car accident in which appellant and another man, Ronald Young, were in their employer's work van. The van went off the road, traveled across John Blackburn's property and crashed into a vehicle parked in the garage, thereby pinning Mr. Blackburn between the vehicle and the back of his garage. Mr. Young was killed in the accident. Mr. Young had multiple injuries, including the presence of "frank blood" which is consistent with a skull fracture which would have rendered Mr. Young unconscious immediately after impact. Appellant was injured and taken to the hospital. Appellant's injuries included injuries to his forehead described as a large ecchymotic area on the right forehead, multiple abrasions which were linear to the right forehead and extending to the scalp, and an internal head injury (a contusion to the frontal lobe of the brain which subsequently had a small amount of swelling). Tr. 215 and 220-221. Shortly after the crash, appellant reported memory problems to a Ohio State Trooper and then medical personnel. However, the facts giving rise to the charges are contested by both appellant and appellee. Therefore, we will reserve further comment on the facts until consideration of the merits of the appeal.
 {¶ 3} Following indictment, appellant failed to appear at the arraignment. A warrant for appellant's arrest was issued. Eventually, appellant was arrested and arraigned on January 3, 2003. At that arraignment, appellant pled not guilty and the case proceeded.
 {¶ 4} Ultimately, appellant entered a guilty plea to the charges and specifications on February 7, 2003. Appellant was sentenced to an aggregate prison term of nine years.[1]
Appellant did not appeal his conviction and sentence.
 {¶ 5} Instead on May 19, 2003, appellant filed a pro se motion to withdraw his guilty plea, pursuant to Crim. R. 32.1. In that motion, appellant asserted that he had a memory loss caused by impacting the windshield on the passenger side of the van and that the blood and hair on the passenger side of the van were his, yet his attorney had refused to have DNA tests conducted. On May 20, 2003, the trial court denied appellant's motion because it had not been properly filed or supported by appropriate evidence.
 {¶ 6} Subsequently, on July 21, 2003, appellant filed a pro se petition to vacate or set aside sentence (postconviction relief pursuant to R.C. 2953.21). In the motion, appellant argued that his attorney was ineffective because the attorney refused to obtain DNA testing and medical records to prove appellant was the passenger in the van. On February 10, 2004, appellant filed a motion for leave to file a supplemental brief in support of his petition for postconviction relief and in support of a renewed motion to withdraw guilty plea. On February 11, 2004, the trial court granted appellant's motion for leave to file the supplemental brief. Subsequently, on March 15, 2004, appellant filed a petition for postconviction relief and renewed motion to withdraw guilty plea.
 {¶ 7} Ultimately, an evidentiary hearing on appellant's motions was conducted on October 1, 2004, and October 4, 2004. On November 4, 2004, the trial court issued a Judgment Entry in which it denied appellant's motions. As to appellant's petition for postconviction relief, the trial court held that appellant's trial counsel, Attorney Wayne Graham, had not been ineffective for failing to investigate appellant's case. The trial court concluded that appellant had made an objective decision, to accept a negotiated plea as opposed to going to trial after being provided with all of the relevant facts. The trial court pointed out that it was appellant who requested that Attorney Graham seek a negotiated plea in which appellant would be sentenced to less than ten years. As to the motion to withdraw the guilty plea, the trial court found that appellant had not shown a manifest injustice.
 {¶ 8} It is from the November 4, 2004, Judgment Entry that appellant appeals, raising the following assignments of error:
 {¶ 9} "I. THE LOWER COURT ABUSED ITS DISCRETION BY IGNORING CONCLUSIVE EVIDENCE OF BENNETT'S INNOCENCE THAT ENTITLES HIM TO RELIEF ON VARIOUS INDEPENDENT GROUNDS.
 {¶ 10} "A. FACTS RELATING TO BENNETT'S GUILTY PLEA.
 {¶ 11} "B. NEW WITNESS: LEE MEADOWS.
 {¶ 12} "C. THE ACCIDENT RECONSTRUCTION EXPERTS.
 {¶ 13} "D. THE DNA EVIDENCE.
 {¶ 14} "II. THE DISTRICT [SIC] COURT ABUSED ITS DISCRETION AND MISAPPLIED THE LAW IN HOLDING THAT BENNETT'S GUILTY PLEA WAS KNOWINGLY AND VOLUNTARILY MADE.
 {¶ 15} "III. THE LOWER COURT INCORRECTLY APPLIED THE LAW REGARDING BENNETT'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM."
 I {¶ 16} In the first assignment of error, appellant contends that the trial court abused its discretion when it ignored conclusive evidence of appellant's innocence that entitled appellant to relief. We agree, to some extent.
 {¶ 17} Appellant sought relief through a motion to withdraw his guilty plea, pursuant to Crim. R. 32.1, and a petition for postconviction relief, pursuant to R.C. 2953.21.
 {¶ 18} Motions to withdraw guilty pleas are governed by Crim. R. 32.1 which states as follows: "A motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." A defendant seeking to withdraw a plea of guilty after sentence has the burden of establishing the existence of manifest injustice. State v. Smith (1977),49 Ohio St.3d 261, 361 N.E.2d 1324. What constitutes "manifest injustice" has been "variously defined, but it is clear that under such standard, a postsentence withdrawal motion is allowable only in extraordinary cases." Id. at 264.
 {¶ 19} Our standard of review is limited to a determination of whether the trial court abused its discretion. State v.Blatnik (1984), 17 Ohio App.3d 201, 202, 478 N.E.2d 1016. An abuse of discretion constitutes more than just an error of law or judgment, it implies that the court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 20} "What constitutes an abuse of discretion with respect to denying a motion to withdraw a guilty plea necessarily is variable with the facts and circumstances involved." State v.Walton (1981), 2 Ohio App.3d 117, 119, 440 N.E.2d 1225. However, we recognize that if a guilty plea could be easily retracted after the imposition of a sentence, "the accused might be encouraged to plead guilty to test the weight of potential punishment, and withdraw the plea if the sentence were unexpectedly severe. . . ." (Citations omitted.) State v.Peterseim (1980), 68 Ohio App.2d 211, 213, 428 N.E.2d 863.
 {¶ 21} On appeal, appellant contends that he presented evidence establishing his innocence that entitled him to relief. We will briefly review the evidence presented at the hearing.
 {¶ 22} Mr. Lee Meadows testified on appellant's behalf.[2] Mr. Meadows testified as follows. Mr. Meadows was the first person to arrive at the scene of the crash. He was the closest neighbor to Mr. Blackburn and the scene of the crash. Mr. Meadows did not give a statement to investigators at the scene of the accident and was not identified as a person on the scene until after appellant had pled guilty.[3]
 {¶ 23} Mr. Meadows testified that he heard the crash and ran over to the scene. He estimated that it took him approximately 60-90 seconds to arrive at the scene of the accident. When he arrived, he saw a person, later identified as appellant, hanging out of the passenger window, "towards the front outside." Tr. Vol. I at 66. Appellant's right arm was hanging out the window in a V shape. Appellant's head was right over the top of his arm. Appellant was unconscious. Appellant had injuries to his face and forehead and was bleeding, although Mr. Meadows described the bleeding as "not gushing." Tr. Vol. I at 66. Mr. Meadows then left the van and went to check on Mr. Blackburn.
 {¶ 24} Mr. Meadows testified that a couple of minutes later, Mr. Ron Richardson arrived on the scene in his car. According to Mr. Meadows, Mr. Richardson looked to see what had happened, said he was going to call 9-1-1, and got back in his car and left.
 {¶ 25} Mr. Meadows then attempted to free Mr. Blackburn. Mr. Richardson returned and attempted to help Mr. Meadows free Mr. Blackburn. During this time, Mr. Meadows returned two or three times to check on appellant. During each of those checks, appellant remained unconscious. Although not noticed immediately on those first checks of appellant, Mr. Meadows eventually noticed that there was a foot under appellant's right arm pit. Appellant's right arm was the arm that was hanging out of the passenger window. The toes of the foot were coming up and the sole was pointed out the window, towards Mr. Meadows. The shoe laces were pointed into appellant's arm pit and towards the front of the van. Tr. Vol. I at 70. Mr. Meadows did not notice where the rest of appellant's or Mr. Young's bodies were at that point. Id. at 66.
 {¶ 26} Eventually, on one of the multiple, subsequent times that Mr. Meadows returned to the van, appellant had shifted to an upright position and was sitting in the middle of the van between the seats. Mr. Meadows went into the back of the van and offered to move appellant. At that time, Mr. Meadows noticed that appellant was sitting on the other occupant's head (Mr. Young's head). Mr. Meadows testified that Mr. Young's body was "wrapped around the passenger seat in the engine compartment." Tr. vol. I at 72. Appellant refused help, saying that he hurt too badly. Mr. Meadows described appellant as dazed. Id. at 79.
 {¶ 27} Mr. Meadows testified that while he was at the scene, he did not see appellant bleeding profusely or losing significant amounts of hair. Further, Mr. Meadows did not see appellant moving around in a fashion that would have caused appellant to lose blood or hair or cause blood or hair to fly around the van.
 {¶ 28} Mr. Ron Richardson was called as a witness for the State. Mr. Richardson is a neighbor of Mr. Blackburn and lived along the road upon which the van was traveling. Mr. Richardson testified as follows. Just prior to the crash, Mr. Richardson heard a loud vehicle approaching and he could tell it was coming at a high rate of speed. Mr. Richardson went to a window and saw a white van passing his home at "a conservative 70 mile [sic] per hour." Tr. Vol. II at 94. It was traveling on the left side of the road.
 {¶ 29} Mr. Richardson's home sits about 65-70 feet from the road. Mr. Richardson testified that he could see the profiles of the individuals in the van and that he observed that the man sitting in the passenger seat was not blonde. Id. at 95. (Appellant has blonde hair.) However, Mr. Richardson could not see the driver.
 {¶ 30} Mr. Richardson testified that after he heard a crash, he drove to the scene of the accident. When he first arrived, Mr. Richardson saw another neighbor, Mr. Meadows, with Mr. Blackburn. Mr. Richardson did not see anyone in the van or any movement in the van.
 {¶ 31} Mr. Richardson then went back home to call 9-1-1. When he returned, he saw Mr. Meadows at the passenger door with the door open, trying to hold appellant up so he did not suffocate Mr. Young.[4] Appellant was not conscious but was moaning.
 {¶ 32} After an attempt to get the driver's side door of the van open, Mr. Richardson and Mr. Meadows went to try and help Mr. Blackburn. After trying to free Mr. Blackburn, Mr. Richardson returned to the van. Appellant was still unconscious but moaning. According to Mr. Richardson, appellant was "kind of laid out over" Mr. Young. Tr. Vol. I at 99.
 {¶ 33} Mr. Meadows and Mr. Richardson then returned to Mr. Blackburn. Eventually, they did free him. After that, Mr. Richardson returned to appellant. According to Mr. Richardson, as he watched, appellant regained consciousness and lifted himself off of Mr. Young. Appellant then sat in the driver's seat, looked around and said to Mr. Richardson that "you've got to get me the fuck out of here." Tr. Vol. I at 102. Mr. Richardson told appellant to get into the back of the van and lay down. Appellant crawled into the back of the van. At about that time, the EMS arrived.
 {¶ 34} Mr. Richardson was also present when firemen attempted to remove Mr. Young from the van. Mr. Richardson testified that there was a wooden seat or crate between the seats of the van that was jammed so tight the fireman could not remove Mr. Young. The firemen had to use saws to remove it so that Mr. Young's body could be removed.
 {¶ 35} Mr. Richardson was interviewed by investigators at the scene. Mr. Richardson signed a statement that day which stated that appellant was driving the van. However, Mr. Richardson did not identify Mr. Meadows to the investigators because Mr. Richardson felt that Mr. Meadows did not want to be involved.
 {¶ 36} Appellant presented the testimony of Rickey Stansifer, an accident reconstructionist.[5] Mr. Stansifer testified that it was his opinion, within a reasonable degree of scientific certainty, that Mr. Young was driving the van and appellant was the passenger in the van. Mr. Stansifer based his conclusion on the following key factors. Neither of the occupants was wearing a seat belt. The driver side of the van was equipped with an airbag. At the time of the accident, the airbag deployed. Thus, Mr. Stansifer asserted that the driver of the van would have hit the airbag at impact. The passenger side of the van was not equipped with an airbag. Mr. Stansifer testified that the damage to the passenger side of the windshield was directly in front of the passenger side and was characteristic of a classic head impact. According to Mr. Stansifer, the initial impact was directly forward so everything not fixed in the van would have moved directly forward. Thus, Mr. Stansifer concluded that the passenger hit the windshield.
 {¶ 37} According to Mr. Stansifer, only appellant's injuries were consistent with hitting and breaking the windshield. The break in the windshield was consistent with having been broken by the impact of a skull and the skull being scraped in a downward motion. Mr. Stansifer testified that appellant's injuries matched this type of windshield break as appellant had a large ecchymotic area on his forehead, with linear abrasions on his forehead reaching up into the scalp.
 {¶ 38} Photos of the van taken shortly after the crash show the broken windshield. Those photos show a significant amount of blood on the windshield, running down the windshield to the dashboard. This blood, as well as hair which was embedded in the windshield, was documented in a Highway Patrol Report of the accident. No blood, at the time of the accident or subsequently, was noted on the driver's side of the van.
 {¶ 39} In September, 2003, appellant's representatives retrieved blood and hair samples from the van. These samples were found on the passenger side of the van. The samples were subjected to DNA testing. The blood samples from the windshield were too degraded to yield results and there was no hair embedded in the windshield. However, non-degraded blood was found on a paper towel still wedged in the trough area at the base of the windshield and the bottom side of a rock. The paper towel and rock are seen in photos taken by the Highway Patrol on the day of the accident. Hair was found on the dashboard of the van and in the trough below the windshield. Some of this hair still had blood and scalp attached. All of the hair and blood samples that were capable of providing DNA results were shown to belong to appellant.
 {¶ 40} Mr. Stansifer was asked if appellant could have been the driver and flown across the van and hit the windshield on the passenger side. Mr. Stansifer replied that due to the way this accident occurred, it was not possible. Tr. Vol. I at 130-131.
 {¶ 41} Further, according to Mr. Stansifer, only Mr. Young showed injuries that would result from the deployment of an airbag. In Mr. Stansifer's opinion, Mr. Young's cause of death was a basilar skull fracture. Mr. Young's injuries, including the cause of his death, were consistent with the deployment of an airbag when the occupant is not wearing a seatbelt. Those injuries included injury to Mr. Young's chest caused when the airbag deployed with Mr. Young too close to the airbag and a basilar skull fracture and chin abrasions caused when the airbag deployed and caught Mr. Young under the chin. Further, according to Mr. Stansifer, Mr. Young's injuries were not consistent with hitting and breaking the windshield.
 {¶ 42} One point of contention concerns where Mr. Young was found and whether that indicated he was the driver or the passenger. Mr. Young was found with his head and left shoulder between the seats on the floor and either his body wrapped around the passenger seat or his "rear" on the passenger seat.[6]
Both parties agree that Mr. Young would have been unable to move himself after impact. Mr. Stansifer testified that, ultimately, the driver of the van would have been tossed slightly to the right during the van's movement after impact. Mr. Stansifer explained that Mr. Young's head, chest and upper torso would have fallen over into the area between the seats. According to Mr. Stansifer, at that point, gravity would have taken over and Mr. Young's legs and feet would have followed his upper body and rolled or flipped onto and then over the engine compartment between the seats. Mr. Stansifer testified that injuries to Mr. Young's legs were consistent with having been injured as his legs were pulled out of the floor board area. Mr. Stansifer further testified that the fact that appellant is first found all the way over on the passenger door, partially hanging out the window, with Mr. Young's foot under his armpit was consistent with his conclusion.
 {¶ 43} The State presented an expert witness as well. Ohio State Highway Patrol Trooper Toby Wagner testified for the State. Trooper Wagner had been a Trooper for 19 years and, at the time of the hearing, was assigned to the Crash Reconstruction 
Analysis Unit. Trooper Wagner concluded that when one considered the physical evidence and the physics involved in the crash, it was clear that appellant was behind the wheel of the van at the time of the crash. Trooper Wagner based that conclusion on several points, as will be discussed.
 {¶ 44} Trooper Wagner asserted that there was no way that appellant was the passenger and struck the windshield on the passenger's side with enough force to break the windshield. Trooper Wagner based this conclusion on the assumed fact that appellant had only a small laceration to the left side of his forehead and that appellant's hospital records indicated that appellant did not complain of headache and did "not hurt anywhere." Further, Trooper Wagner cited one of the SAE papers (Number 942212) submitted by Mr. Stansifer which, at one point, stated that impact with an airbag typically results in minor injuries, versus no airbag. Trooper Wagner asserted that it was "common sense that the person in front of the air bag is going to fare much better than the one who isn't'." Petitioner's Exhibit 31, Trooper Wagner's Conclusions, pg. 2. Thus, Trooper Wagner concluded that appellant must have been in front of the air bag, located in front of the driver's seat.
 {¶ 45} However, on cross examination, several significant problems arose concerning the basis of these conclusions. First, although Trooper Wagner testified that he had been assured that he had all available records, it became apparent that Trooper Wagner did not have all of appellant's records. The records which the Trooper did not have indicated that appellant had additional injuries to his head and that appellant had complained of headache and hurting all over. Furthermore, those hospital records indicated that appellant's injuries were to the right side of his head, not his left. In addition, it was apparent that Trooper Wagner was not familiar with several of the key medical terms found in appellant's medical records which described appellant's injuries. Tr. Vol. I at 211-222.
 {¶ 46} Trooper Wagner conceded that he did not believe that Mr. Young hit the windshield on the passenger side of the van. Tr. Vol. at 234, 246. Trooper Wagner testified that he did not know what hit the windshield, but it would have had to have been spherical and the size of a head. On cross examination, Trooper Wagner agreed that if it were not someone's head, it would have had to have been an object in the van that flew forward, up off the floor, and hit the windshield straight on while possibly avoiding the seatback on the passenger seat. Id. at 234-236.
 {¶ 47} Second, after a significant amount of difficulty, Trooper Wagner admitted that there was research and information from the National Highway Transportation Safety Administration (NHTSA) that indicated that air bags may cause death when an occupant is too close to the airbag. Id. at 222. As to Mr. Young, Trooper Wagner acknowledged that Mr. Stansifer provided documentation that the deployment of the airbag could have caused a basilar skull fracture to Mr. Young's head. However, Trooper Wagner argued that Mr. Stansifer did not provide test results to indicate that the deployment of this van's air bag could have caused the skull fracture suffered by Mr. Young.
 {¶ 48} Trooper Wagner stated that the biggest problem with appellant's theory was where Mr. Young was found in the van at final rest. Trooper Wagner's Conclusions at pg. 2. Trooper Wagner testified that Mr. Young's torso was found lying on his left side, facing front, with his head and left shoulder on the floor. According to Trooper Wagner, Mr. Young's "rear" was on the passenger seat.[7] Because the impact was centered through the van, everything moved forward, including occupants. Therefore, Trooper Wagner concluded that it seemed apparent that, at impact, Mr. Young was laying in the van similar to how he was found at final rest. Trooper Wagner stated that his conclusion was supported by the fact that Mr. Young's head was so tightly trapped by a chair, that presumably moved from the back of the van, that he could not be removed immediately.
 {¶ 49} Trooper Wagner attempted to explain how and why appellant's blood was found on the passenger side of the van. Trooper Wagner asserted that appellant was moving around the van and deposited blood wherever he went.[8]
 {¶ 50} Appellant testified on his own behalf. He stated that after the crash, he had no memory of the incident. He testified that he learned of Mr. Young's death, who he described as his best friend, from his father who told him that he (appellant) had killed Mr. Young because people at the accident scene said so.
 {¶ 51} Appellant attempted to explain why he fled after he learned he was being charged and why he eventually entered a plea. Appellant stated that he fled because he was scared that he was going to be convicted and he knew he was innocent. Prior to the plea, appellant claimed that his mind was playing games with him. He would have inconsistent ideas as to what happened at the time of the crash. Appellant stated that he saw the pictures of the van which showed Mr. Young dead and stuck in the van. These photos caused appellant to feel both that he had killed his best friend and that the pieces did not add up to appellant being the driver. Appellant claimed that he had asked his counsel, Attorney Wayne Graham, for DNA testing of the blood and hair on the windshield and dash and for appellant's medical records. Appellant testified that since he felt nothing was getting done, he began to feel he was in the middle of a conspiracy and that the Judge, Prosecutor and Defense Attorney were in on it. Appellant stated that as a result, he decided to plead guilty. However, appellant then had second thoughts and, after having entered the plea, attempted suicide.
 {¶ 52} Dr. John Kennedy, a forensic psychiatrist, testified on appellant's behalf.[9] Dr. Kennedy opined that as a result of a head injury that appellant sustained in the crash, appellant lacked memory of the crash, events prior to the crash and events after the crash. Tr. Vol. I at 315. Dr. Kennedy stated that appellant's medical records and brain injuries, and appellant's behavior, both at the scene and after, are all very consistent with loss of memory. Dr. Kennedy noted that appellant repeatedly indicated to personnel at the hospital and to his attorney that he did not recall anything about the accident. According to Dr. Kennedy, appellant's memory, however, became contaminated by others, including appellant's father, who told him he was driving and provided various details and facts concerning the crash. Basically, Dr. Kennedy stated that when one does not have a memory of an event, one's mind attempts to come up with a story, using the information provided by others and then fills in the gaps. The more pressure one feels to remember, the more likely one's mind is to confabulate, or, in other words, fill in the gaps. Id. at 322-324.
 {¶ 53} In this case, Dr. Kennedy felt that, at this point, appellant's memory may or may not have returned. It was possible, in Dr. Kennedy's opinion, that appellant still had no true memory concerning the events of the crash but had simply been given enough information and felt enough pressure to come to believe he remembered the crash. Id. at 327-328.
 {¶ 54} Attorney Wayne Graham also testified for the State. Attorney Graham testified that while appellant never expressly told him that he was the driver of the van that is what he took away from their conversation. Attorney Graham further testified that appellant often changed his story as to what happened that night. Each time appellant would be presented with new facts or facts that disagreed with a prior story, appellant would suggest a new story. However, Attorney Graham testified that there came a point when appellant began to forget things or not remember things. The forgetting appeared to be in direct response to being pushed to deal with some of the hard issues that were expected to arise on cross examination in a trial.
 {¶ 55} Attorney Graham stated that while he was in the process of investigating the case, appellant told him that he was interested in a plea, if the sentence would be less than ten years. At the point that the plea agreement was reached, Attorney Graham had not reviewed appellant's medical records nor sought out or interviewed Mr. Meadows. Essentially, according to Attorney Graham, appellant's decision to enter a plea interrupted the investigation that would have possibly led to a trial of the matter.
 {¶ 56} The above cited facts cannot begin to capture all of the evidence and testimony presented in this case. However, the recitation of evidence and testimony highlights the issues involved.
 {¶ 57} We will first address appellant's motion to withdraw his guilty plea. The trial court held that appellant failed to show a manifest injustice so as to justify allowing appellant to withdraw his guilty plea. This court recognizes that this is a difficult case and that this court's standard of review is quite high. However, it is not an impossible standard.
 {¶ 58} In this case, the evidence was quite contested. However, this court has come to the conclusion that appellant has met his burden to show that the trial court abused its discretion when it denied appellant's motion to withdraw his guilty plea. The evidence presented leaves this court with very serious questions as to who was really driving the van. At this point, there seems to be little, if any, explanation for the broken windshield on the passenger side, save appellant's assertion that it was his head that broke the windshield while appellant was a passenger. This assertion is supported by the fact that appellant suffered a head injury that, from the evidence, appears consistent with hitting the windshield and only appellant's blood and hair were found on the passenger side of the windshield in the area where blood and hair were noted on the day of the accident. Likewise, there is little explanation as to what or how Mr. Young's skull was fractured, save appellant's assertion that the airbag caused the fracture. Such a fracture is consistent with airbag deployment when one is not wearing a seatbelt. Thus, the physical evidence presented thus far supports appellant's assertion that he was the passenger. Further, we are troubled that the State's expert did not base his written report on a review of appellant's complete medical records and did not understand key words in appellant's medical records. Last, the newly identified witness, Mr. Meadows, described the scene when he was the first person to arrive after the crash. His testimony places appellant on the passenger side of the van and describes appellant as unconscious and, later, as dazed.[10]
 {¶ 59} We do not mean to insinuate that appellant has proven that he was not the driver of the van. However, the evidence is such that we find that when all of the evidence is considered, appellant has met his burden to demonstrate that he should be allowed to withdraw his plea to correct a manifest injustice and that the trial court abused its discretion in denying the motion to withdraw a guilty plea. This is the rare and extraordinary case in which the defendant should be permitted to withdraw his guilty plea. We find that justice requires that appellant be given an opportunity to present the evidence in a trial. To fail to do otherwise would constitute a manifest injustice.
 {¶ 60} Accordingly, we sustain appellant's first assignment of error as it pertains to appellant's motion to withdraw his guilty plea. Further, we find that based upon that holding, the first assignment of error as it pertains to appellant's petition for postconviction relief is overruled as moot.
 II III {¶ 61} In the second assignment of error, appellant contends that the trial court abused its discretion and misapplied the law when it found that appellant's guilty plea was knowingly and voluntarily entered. In the third assignment of error, appellant claims that the trial court incorrectly applied the law regarding appellant's ineffective assistance of counsel claim. In light of this court's holding in Assignment of Error I, appellant's second and third Assignments of Error are moot.
 {¶ 62} The judgment of the Stark County Court of Common Pleas is hereby reversed. The matter is remanded for further proceedings consistent with this opinion.
Edwards, J. Boggins, P.J. and Hoffman, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is reversed and this matter is remanded for further proceedings. Costs assessed to appellee.
[1] Appellant was given nine years on aggravated vehicular homicide, seven years on aggravated vehicular assault, six months on driving while intoxicated and six months on driving while under suspension. The sentences were ordered to be served concurrently with each other. The court also imposed a lifetime suspension of Bennett's operator's license for the aggravated vehicular homicide conviction.
[2] The evidence is not discussed in the order in which it was presented at the hearing. It is discussed in a manner that best explains the issues raised and facts presented. Further, although the evidence presented by the State is discussed, this court remains cognizant that the burden both as a movant and an appellant remains with appellant.
[3] Mr. Meadows was still at the scene of the accident when EMS and the Ohio State Highway Patrol arrived. Mr. Meadows admitted that he did not identify himself at the scene as a witness or the first person at the scene when asked by one of the investigators.
[4] Mr. Meadows did not recall ever opening the passenger door. As far as Mr. Meadows recalled, he got into the van through the cargo doors. Tr. Vol. I at 77.
[5] Mr. Stansifer is an expert accident reconstructionist with over 30 years of experience in accident reconstruction. He is a registered Professional Engineer (P.E.) in the State of Ohio and the State of Missouri. He is a Senior Project Engineer at SEA, Ltd. and he is responsible for project activities including accident reconstruction. He claims to have investigated over 2,200 accidents and to have been qualified to testify as an expert in Ohio and 16 other states in both state and federal jurisdictions.
[6] This discrepancy arises because Mr. Meadow's description of where Mr. Young was found differs from how an EMS person allegedly described Mr. Young's position when the EMS person arrived. The EMS person did not testify but the contents of a report purportedly prepared by that EMS person was testified to and relied upon by the State's expert witness, Trooper Wagner.
[7] Trooper Wagner based his description on a statement by one of the responding EMS persons. However, this description is somewhat different from the description given by Mr. Meadows. Mr. Meadows testified that, initially, one of Mr. Young's feet was out the window and under appellant's armpit. Subsequently, Mr. Meadows testified that Mr. Young's body was wrapped around thepassenger seat in the engine compartment. Tr. Vol. I at 72.
[8] We note that this assertion conflicts with the testimony of Mr. Meadows and, to a lesser extent, the testimony of Mr. Richardson.
[9] Dr. Kennedy graduated from Hillsdale College with a degree in biology. He attended Ohio State University both for medical school and graduate school in hospital administration. After graduating from those two programs, he did a residency in psychiatry at Ohio State University, serving his fourth year as chief resident. Upon graduating from the psychiatry residency, he went to Rochester, New York, and completed a fellowship in forensic psychiatry. After finishing the forensic psychiatry fellowship, he worked on the faculty of the fellowship there. He also worked in the maximum security forensic hospital in Rochester and worked at Strong Memorial Hospital in the psychiatric emergency room. In the year 2000, Dr. Kennedy accepted a position as Assistant Professor of Psychiatry at the University of Cincinnati. There, he is the program director of the Forensic Psychiatry Fellowship and Director of the Institute of Psychiatry and Law. Dr. Kennedy has also worked at Summit Behavioral Health Care, the largest state hospital in Ohio, on a forensic unit, and is now the director of Forensic Services at Summit. Tr. Vol. I at 309-310.
[10] We also note that appellant suffered a documented head injury during the crash. While claims of amnesia are always somewhat dubious in criminal cases, appellant's claims were documented better than most claims and are supported by expert testimony.