THE STATE OF OHIO, APPELLEE, v. POWELL, APPELLANT.

[Cite as State v. Powell (1990), 49 Ohio St. 3d 255.]

(No. 88-1666—Submitted October 11, 1989—Decided March 14, 1990.)

*Arthur M. Ney, Jr.,* prosecuting attorney, and *William E. Breyer,* for appellee.

*Louis H. Bolce* and *John K. Issenmann,* for appellant.

MOYER, C.J. We have reviewed Powell's seven propositions of law, independently balanced the aggravating circumstances against the mitigating factors, and evaluated the proportionality of the sentence to those imposed in similar cases. As a result, we affirm the convictions and sentence of death.

In his second proposition of law, Powell contends that the trial court should have appointed a psychiatrist to "assist in evaluation, preparation, and presentation of the defense." *Ake* v. *Oklahoma* (1985), 470 U.S. 68, 83.

*Ake* held "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* The trial court's decision will not be disturbed absent abuse of discretion. *United States* v. *Blade* (C.A. 8, 1987), 811 F. 2d 461, 467.

It is not enough for the defendant to show that his sanity may possibly be a significant factor. "[A] defendant must show a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." *Little* v. *Armontrout* (C.A.8, 1987), 835 F. 2d 1240, 1244, quoted in *State* v. *Broom* (1988), 40 Ohio St. 3d 277, 283, 533 N.E. 2d 682, 691. The "reasonably necessary" standard of R.C. 2929.024 comports with this standard. *Broom, supra.*

Powell argues that, at the hearing on his competence to stand trial, the court had introduced evidence of his mental history that was sufficient to show that his sanity at the time of the offense was to be a significant factor at trial.

At the hearing, the court had before it one exhibit and one witness, Dr. Nancy Schmidtgoessling, a clinical psychologist who had examined Powell on December 31, 1986, in order to evaluate his competence to stand trial. As a result of this examination, Schmidtgoessling formed an opinion that Powell was not only competent to stand trial, but legally sane.

Defendant's Exhibit 1 comprised three psychiatric evaluations of Powell, one written in 1978 (the Branch report) and two written in 1981 (the Lagan and O'Connell reports). The reports indicate that Powell had a low intelligence quotient. The Branch report categorizes Powell as "within the mild mentally retarded to borderline defective range of ability * * *." The Lagan and O'Connell reports indicate that, by 1981, Powell had progressed, but remained in the "borderline mentally deficient range."

On the other hand, the Branch report also states that "[a]t no point in the interview did [Powell] demonstrate any signs of a disturbed thought process or bizarre thought pattern, and he was well attuned to person, place and time." The Lagan report states: "Clinical evaluation shows no evidence of any psychotic process * * *." All three reports note that an electroencephalogram, or EEG, taken in 1978 was normal; indeed, the Lagan report indicates that the EEG rules out organic brain damage.

This evidence did not show that Powell's "sanity at the time of the offense [was] to be a significant factor at trial." Although Schmidtgoessling and the authors of the three reports agreed that Powell was mentally retarded, there was no evidence that he was legally insane, and Schmidtgoessling concluded that he was legally sane. Cf. *State* v. *Newcomer* (1987), 48 Wash. App. 83, 93, 737 P. 2d 1285, 1291.

In *Cartwright* v. *Maynard* (C.A. 10, 1986), 802 F. 2d 1203, reversed in part on other grounds (C.A.10, 1987), 822 F. 2d 1477, affirmed (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S.Ct. 1853, the court relied on the following factors in holding that a defendant had failed to make the required showing:

"During * * * Cartwright's stay at the hospital, his actions and conduct were very normal and cooperative; he displayed a calm disposition and was never on *any* medication. He did not display any erratic or bizarre behavior, as in *Ake.* The doctors did not diagnose him as having *any* mental illness. He was not diagnosed as suffering from any psychotic disorder * * *. A complete physical examination did not disclose any neurological problems. The electroencephalogram test was normal. Cartwright's I.Q. tested at 98, which is considered to be average intelligence." (Emphasis *sic.*) *Cartwright, supra,* at 1212.

Although Powell exhibited no bizarre behavior, there was evidence that he had once been placed on

Thorazine, an antipsychotic drug. His intelligence was significantly below normal; nevertheless, Schmidtgoessling did not believe that his retardation made him unable to tell right from wrong or adhere to the right. Although no recent EEG had been taken, the one taken in 1978 had been normal. During the trial, Schmidtgoessling testified that Powell denied any history of head injury. Nor did he have "unusual" speech problems, which indicated that he suffered from no thought or mood disorder.

Moreover, Powell did not plead not guilty by reason of insanity. This factor is not decisive, for a defendant may need a psychiatrist's assistance "to help determine whether the insanity defense is viable," *Ake, supra,* at 82, as well as to help present it. However, the lack of an insanity plea can be considered in determining whether the threshold showing has been made. *Cartwright* v. *State* (Okl. Crim. App. 1985), 708 P. 2d 592, 595.

We conclude that Powell failed to show a reasonable probability that his mental condition would be a significant factor in the guilt phase. On these facts, he has not shown that a "fairly debatable" question exists. *Volson* v. *Blackburn* (C.A.5, 1986), 794 F. 2d 173, 176.

The court in *Ake* also analyzed whether the defendant's mental condition "was a significant factor at the sentencing phase." *Ake, supra,* at 86. However, the United States Court of Appeals for the Sixth Circuit has recently held that "*Ake* only guarantees a defendant the right to a psychiatrist at the sentencing phase to oppose the government's psychiatric testimony." *Kordenbrock* v. *Scroggy* (C.A.6, 1989), 889 F.2d 69, 77. Accord *Bowden* v. *Kemp* (C.A.11, 1985), 767 F. 2d 761, 764, fn. 5; *Nixon* v. *State* (Miss. 1987), 533 So. 2d 1078, 1096-1097.

Here, as in *Kordenbrock,* "the state presented no psychiatric experts at the sentencing phase." *Kordenbrock, supra,* at 13. We therefore hold that *Ake* was not violated and overrule Powell's second proposition of law.

In his first and third propositions of law, Powell contends that the trial court should have continued the penalty phase so that Dr. Schmidtgoessling could obtain further information bearing on Powell's mental condition.

On January 15, 1987, the jury rendered its verdict in the guilt phase. On January 16, the court ordered Schmidtgoessling to conduct a presentence psychological examination of Powell. On January 20, the day the penalty phase was to begin, Schmidtgoessling submitted her report to the trial court out of the jury's presence. She testified that, having examined Powell, she did not know whether his "behavior and psychological functioning" might be affected by an "organic impairment" such as brain damage or chemical imbalance.

Schmidtgoessling testified that she could not make a complete diagnosis without "a full neurological and clinical workup" including a CAT scan, and "a neuro-psychological workup." She had not performed these tests because, as a psychologist, she was not competent to do so. She also thought it necessary to contact "family members and other persons who know that person well, [such as] teachers, [or] employers." She had not had time to do that between January 16 and January 20.

On the basis of this testimony, the defense requested a continuance. Despite Schmidtgoessling's opinion that she needed further testing "to fully understand" Powell, the court refused the continuance.

Schmidtgoessling testified again in the penalty phase, this time before the jury; in fact, she was the only witness.

She testified that, in her opinion, Powell suffered from "some sort of subtle brain damage" that she could not measure without testing.

As Powell concedes, trial courts have broad discretion to decide whether to grant a continuance. *Morris* v. *Slappy* (1983), 461 U.S. 1, 11; *State* v. *Unger* (1981), 67 Ohio St. 2d 65, 67, 21 O.O. 3d 41, 43, 423 N.E. 2d 1078, 1080. Whether the court has abused its discretion depends upon the circumstances, "particularly * * * the reasons presented to the trial judge at the time the request is denied." *Ungar* v. *Sarafite* (1964), 376 U.S. 575, 589.

The reviewing court must weigh potential prejudice against "a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." Relevant factors include "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or * * * dilatory, purposeful, or contrived; [and] whether the defendant contributed to the circumstance which gives rise to the request * * *." *State* v. *Unger, supra,* at 67-68, 21 O.O. 3d at 43, 423 N.E. 2d at 1080.

Here, as in *State* v. *Unger, supra,* at 69, 21 O.O. 3d at 44, 423 N.E. 2d at 1081, "the record is totally devoid of any indication of what the potential delay might have been if appellant had successfully secured" a continuance. Although Powell now suggests that "a day or two" would have been reasonable, he did not then ask the trial court for any specific amount of time. See *Giacalone* v. *Lucas* (C.A.6, 1971), 445 F. 2d 1238, 1242-1243. The record before us contains no estimate of how long neurological tests and background interviews would have taken. More-

over, "the motion for continuance was not made until the day of the scheduled hearing * * *." *Ungar* v. *Sarafite, supra,* at 590.

On the other hand, there had been no other continuances, nor does the record suggest that a continuance would have unduly inconvenienced the state, the prosecutors, or the court.

Nor do we think that the request was a mere delaying tactic. Contrary to the state's position, there was evidence that appellant's brain might have been damaged. Schmidtgoessling testified that Powell's low intelligence indicated "a high probability" of subtle brain damage. While it is true that the EEG taken in 1978 did not indicate brain damage, Schmidtgoessling testified that an EEG cannot detect all forms of brain damage.

Another factor militating in favor of a continuance is that Schmidtgoessling thought that the additional examination was necessary. However, she was vague as to why it was necessary, stating only that she "could not make a complete diagnosis without those tests."

Powell points out that it is important that the jury have as much relevant evidence as possible when it decides whether a defendant deserves to die. Of course, the trial court did not exclude or refuse to consider any relevant evidence. Cf. *Lockett* v. *Ohio* (1978), 438 U.S. 586; *Eddings* v. *Oklahoma* (1982), 455 U.S. 104; *Skipper* v. *South Carolina* (1986), 476 U.S. 1. However, the importance of fully informing the jury undeniably weighs in favor of granting a continuance here.

On the other hand, the relevance of subtle brain damage to mitigation was called into question by Schmidtgoessling's testimony. She stated that when a person has a subtle impairment, "although it affects their dysfunction, they are able to adapt so that it doesn't

impair their conduct." She said that such people "have no severe behavioral problem." This testimony strongly indicates that, even if Powell suffered from subtle brain damage, it did not contribute to his crime. Thus, it would seem irrelevant to mitigation.

It should be noted that Dr. David T. Tharp, who did not testify, but whose report was placed in evidence, stated that Powell "exhibits evidence of having a tension discharge disorder." Schmidtgoessling explained to the jury that this disorder "is thought to be due to a discrete, subtle type of brain damage." It is characterized by "an increasing level of * * * pressure internally, which tends to be discharged in activity. * * *" She testified that tension discharge disorder cannot be voluntarily controlled: "It builds up over time, and it must be released behaviorally."

This seems to contradict Schmidtgoessling's testimony, quoted above, that subtle brain damage does not impair conduct or cause behavioral problems. Nevertheless, if neurological testing had revealed the presence of subtle brain damage, as Schmidtgoessling thought it might, such evidence might have proved useful to corroborate the Tharp report's somewhat tentative statement that Powell "exhibit[ed] evidence" of tension discharge disorder.

However, the trial court was not aware, at the time the continuance was requested, that tension discharge disorder could result from subtle brain damage. Schmidtgoessling's testimony to the jury on this point came only *after* the trial court had refused the continuance.

Finally, Powell points out that Schmidtgoessling wanted more time to contact Powell's relatives and acquaintances. But Schmidtgoessling was able to testify for Powell in the guilt phase without having spoken to these people. She had reviewed the juvenile court file on Powell, which contained numerous reports on Powell's interaction with others at various schools and treatment centers. Moreover, she knew enough about Powell's relationship with his parents to testify in the penalty phase that inadequacies in that relationship had caused him to have a conduct disorder.

"An abuse of discretion is more than an error of law or judgment. It implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable." *State, ex rel. Beacon Journal Publishing Co.,* v. *Akron Metro. Hous. Auth.* (1989), 42 Ohio St. 3d 1, 2, 535 N.E. 2d 1366, 1367. The trial court here refused to grant a continuance of indeterminate length for the purpose of allowing the defense to develop evidence that, given Schmidtgoessling's testimony, was of dubious relevance. Balancing all the factors, we cannot say that the trial court abused its discretion. Accordingly, Powell's first and third propositions of law are overruled.

In Powell's fourth proposition of law, he argues that his conviction of attempted rape was against the weight of the evidence. Since we may not review the weight of the evidence, *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, 26, 544 N.E. 2d 895, 905-906, we treat this proposition of law as dealing with the legal sufficiency of the evidence.

Powell was charged with rape under R.C. 2907.02(A)(1)(b), which provides:

"No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * *:

"* * *

"(b) The other person is less than thirteen years of age, whether or not

the offender knows the age of such person."

Powell argues that the evidence did not show that he attempted to engage in sexual conduct with Trina. Although Powell ordered her to take off her clothes, he contends that this was not an attempt to engage in sexual conduct.

A criminal attempt is an act that is a substantial step in a course of conduct planned to culminate in the commission of the crime. A substantial step is one that strongly corroborates the actor's criminal purpose. *State* v. *Woods* (1976), 48 Ohio St. 2d 127, 2 O.O. 3d 289, 357 N.E. 2d 1059, paragraph one of the syllabus, vacated on other grounds (1978), 438 U.S. 910. It is true, as Powell observes, that having Trina strip was not necessary to engage in sexual conduct with her. But a step need not be necessary to the commission of the crime to constitute an attempt. It need only be "substantial" as *Woods* defines that term. Powell's ordering this seven-year-old child to take off her clothes strongly corroborates his criminal purpose to engage in sexual conduct with her, and is thus a substantial step under *Woods.*

Powell argues that having Trina strip could have been a step in a course of conduct planned to culminate in an offense other than rape. However, Powell confessed to Hoffman that he "was going to" have sex with Trina. Thus, the evidence showed (a) Powell's purpose to have sex with Trina and (b) an act (having her strip) that was strongly corroborative of that purpose.

Powell also argues that the state failed to prove that he attempted to compel Trina to submit to sexual conduct by force or threat of force. He overlooks that, where the victim is under thirteen, the use of force is not an element of rape. See R.C. 2907.02 (A)(1)(b). Even if the state failed to prove that Powell used force or threatened to use it, the conviction of attempted rape and of the capital specification based on attempted rape must stand.

Had Powell been convicted of rape, we would nonetheless have to determine whether force was proved beyond a reasonable doubt, because that question would affect the sentence. Under R.C. 2907.02(B), the forcible rape of a victim under thirteen subjects the offender to a life sentence. (Thus, the indictment in this case alleged the use of force as well as alleging that Trina was under thirteen.) However, Powell was convicted of attempted rape. No statute enhances the penalty for the *attempt* to forcibly rape a victim under thirteen. Under R.C. 2907.02(B), rape in any form is a first-degree aggravated felony. Therefore, attempted rape, whether forcible or not, is always a second-degree aggravated felony. R.C. 2923.02(E). Powell's fourth proposition of law must be overruled.

In his fifth proposition of law, Powell argues that the kidnapping of Trina Dukes was an allied offense of similar import to the aggravated murder and attempted rape. R.C. 2941.25(A).

Powell's argument that the kidnapping and aggravated murder were allied offenses of similar import is clearly incorrect. "[W]here murder * * * is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense." *State* v. *Logan* (1979), 60 Ohio St. 2d 126, 135, 14 O.O. 3d 373, 379, 397 N.E. 2d 1345, 1352.

"This court has set forth a two-tiered test to determine whether two crimes with which a defendant is charged are allied offenses of similar import. In the first step, the elements of the two crimes are compared. If [they] * * * correspond to such a

degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import * * *. In the second step, the defendant's *conduct* is reviewed * * *. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses." (Emphasis *sic*.) *State* v. *Blankenship* (1988), 38 Ohio St. 3d 116, 117, 526 N.E. 2d 816, 817.

Kidnapping is "implicit within every forcible rape." *State* v. *Mitchell* (1983), 6 Ohio St. 3d 416, 418, 6 OBR 463, 464, 453 N.E. 2d 593, 594. Count Five of the indictment charges Powell with forcible rape. The crimes are therefore allied offenses of similar import.

The next step is to determine "whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense." *Logan, supra,* at 135, 14 O.O. 3d at 378, 397 N.E. 2d at 1351.

Even if the kidnapping was merely incidental to the attempted rape, however, it was a separate offense if it subjected the victim "to a substantial increase in the risk of harm separate from that involved in the underlying crime." *Logan, supra,* at 135, 14 O.O. 3d at 378, 397 N.E. 2d at 1352. Powell took Trina to the fourth floor of the building. This made it possible for him to throw her out the window to her death. Obviously, Powell thereby increased the risk that Trina would suffer harm extrinsic to the rape. We accordingly overrule this proposition of law.

In his sixth proposition of law, Powell argues that his conviction of two counts of kidnapping under R.C. 2905.01(A)(4) was against the manifest weight of the evidence. Again, we treat this proposition of law as dealing with the sufficiency of the evidence.

Count Three of the indictment charged Powell with restraining Trina Dukes, a person under thirteen, of her liberty for the purpose of engaging in sexual activity with her against her will. Count Four charged him with removing her from the place where she was found for the same purpose.

Powell claims that there was insufficient evidence that sexual activity actually occurred. However, R.C. 2905.01(A)(4) requires only that the restraint or removal occur for the purpose of non-consensual sexual activity — not that sexual activity actually take place.

Powell further contends that the state failed to prove beyond a reasonable doubt that he restrained Trina for the purpose of engaging in sexual activity with her against her will. He argues that his purpose was not to engage in sexual activity with her, but to look at her. We cannot accept this contention. To the contrary, his purpose to engage in sexual activity was amply proven by his ordering Trina to strip, his removal of his own shirt, and his admission that he had intended to "fuck" her.

Powell also argues that, assuming that his purpose to engage in sexual activity was proven, the state did not prove that he *restrained* her for that purpose, as required for a conviction on Count Three. He contends that Trina was not restrained until he grabbed her mouth. That restraint, he argues, was for the purpose of keeping her quiet, not for the purpose of sexual activity. Powell argues that merely keeping her on the fourth floor of the building was not "restraint," because no force was used.

Powell overlooks two points. First, under R.C. 2905.01(A), where a victim

under thirteen is restrained, the use of "force, threat, or deception" is not an element of the crime. Merely by keeping her with him, he restrained her, whether he used physical force or not. "[U]nder this section it makes no difference whether the child * * * voluntarily accompanies the kidnapper or submits to restraint." Legislative Service Commission Comment to R.C. 2905.01.

Second, while his attempt to quiet Trina could have been for the purpose of avoiding detection, the jury could have found beyond a reasonable doubt that it was also meant to further his sexual assault on her. Indeed, it hardly seems reasonable to believe that this restraint was for the *sole* purpose of avoiding detection — *i.e.,* that Powell no longer intended to have sex with Trina, but instead would have either released her or killed her, had he escaped detection, without achieving his original purpose to "fuck" her. Thus, even had grabbing Trina's mouth been the only restraint Powell used, a reasonable jury could have found beyond a reasonable doubt that the restraint was imposed for the purpose of engaging in sexual activity with Trina against her will.

Even if we held the evidence somehow insufficient as to Count Three (charging kidnapping by restraint), it was clearly sufficient as to Count Four (charging kidnapping by removal). Since the trial court merged the kidnapping convictions with one another, Powell received only one sentence for kidnapping, and an erroneous verdict on Count Three would be harmless beyond a reasonable doubt. Thus, a finding of error on Count Three could not affect the sentence. Powell's sixth proposition of law is overruled.

In his seventh proposition of law, Powell argues that the trial court and court of appeals incorrectly weighed the aggravating circumstances and mitigating factors.

Powell argues that low IQ is "evidence" of a mitigating factor under R.C. 2929.04(B)(2) (duress, coercion, provocation) and 2929.04(B)(3) (lack of substantial capacity). He cites *State* v. *Hooks* (1988), 39 Ohio St. 3d 67, 70, 529 N.E. 2d 429, 432, in which we said: "Obviously, the disability makes it more likely that the offender will be influenced by even a mild form of duress. Moreover, the disability clearly can play a role in the offender's ability to recognize the criminality of his conduct."

While Powell may well have been more susceptible to duress because of his low IQ, there is no suggestion in this record that he was subjected to duress. As for the R.C. 2929.04(B)(3) mitigating factor, it is clear that the trial court and court of appeals considered it. The trial court found that it had not been established, and the court of appeals found it "without mitigating value" in light of Schmidtgoessling's testimony that individuals with subtle brain damage "have no severe behavioral problem." Although we will make our own determination on these points, we see no error of law in these conclusions.

Powell argues that the trial court and court of appeals should have considered that Powell was only nineteen when he murdered Trina. In fact, they did consider Powell's age, although they gave it little weight in mitigation. The trial court said it was not a "*significant* mitigating factor" (emphasis added); the appellate court found it "entitled to little weight."

We find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. There was no error in the weighing of the aggravating circumstances and mitigat-

ing factors by the trial court or the court of appeals. Powell's seventh proposition of law is overruled.

Finally, we must independently review the death sentence for appropriateness and proportionality.

As previously noted, Schmidtgoessling testified that Powell was mentally retarded. Moreover, there was evidence that he had a tension discharge disorder, which could have impaired his capacity to act voluntarily.

Schmidtgoessling also testified that Powell had a "conduct disorder" consisting of a lack of guilt and a lack of appreciation for the feelings of others. She explained that "he has a history of antisocial behavior, and that is exactly what conduct disorder means." We have previously observed that such a definition of the term "could apply to virtually every criminal." *State* v. *Cooey, supra,* at 41, 544 N.E. 2d at 919. For this reason, in *Cooey* we gave the appellant's conduct disorder "relatively little" weight.

However, in this case Schmidtgoessling testified that Powell's conduct disorder was caused by Powell's family environment. Powell's father was absent from the household; his mother was "out of touch." As a result, Schmidtgoessling opined, Powell suffered "feelings of emptiness, abandonment, sadness, and

* * * fearfulness in a hostile environment in which his needs are overlooked and denied * * *." His conduct disorder was the result of his attempts to "master these feelings and attain some level of satisfaction and security * * *." This evidence is unquestionably entitled to some mitigating weight, for it suggests that Powell's behavior may not be entirely his own fault.

Powell's retardation, his youth, and his lack of parental nurturing are all entitled to some weight in mitigation. However, we find that the aggravating circumstances of kidnapping and attempted rape clearly outweigh these mitigating factors beyond a reasonable doubt.

Finally, the death sentence is proportionate to those imposed for rape-murder and kidnap-murder in previous cases. See *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383; *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 17 OBR 414, 478 N.E. 2d 984; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768.

We affirm appellant's convictions and sentence of death. The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

Sweeney, Holmes, Douglas, Wright, H. Brown and Resnick, JJ., concur.