The STATE of Ohio, Appellee,

v.

LOPEZ, Appellant.

[Cite as *State v. Lopez,* 186 Ohio App.3d 328, 2010-Ohio-732.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2008–12–291.

Decided March 1, 2010.

Robin N. Piper III, Butler County Prosecuting Attorney, and Michael A. Oster Jr., Assistant Prosecuting Attorney, for appellee.

Fred S. Miller, for appellant.

YOUNG, Judge.

{¶ 1} Defendant-appellant, Daniel Estrada Lopez, appeals his conviction in the Butler County Court of Common Pleas for one count of aggravated murder. We affirm the decision of the trial court.

{¶ 2} In the early morning hours of June 1, 2008, Gloria Applegate's body was discovered in an alleyway that separates the 500 block of East Avenue and South 11th in Hamilton, Ohio, a notoriously high-crime area. Applegate's body was nude except for socks and shoes, and she had been shot at close range in the head.

{¶ 3} Hamilton police were familiar with Applegate, as she was a known prostitute in the area and had been arrested on several occasions, including the night she was murdered. According to police records, Applegate was arrested at approximately 5:30 to 6:00 p.m. for throwing a can of beer at a police cruiser after officers spoke with her about having an open container and being intoxicated in public. After spending a few hours in jail, Applegate was released around 11:30 p.m. and found dead at 3:14 a.m. For several days after the discovery, police had no suspects in Applegate's murder until they received an anonymous tip.

{¶ 4} As a result of the tip, Detective Jim Smith with the Hamilton Police Department located and interviewed Lucy Morales Garcia, who divulged that Lopez had killed Applegate. As Smith questioned her, Garcia gave her statement to Officer Eric Taylor, who spoke fluent Spanish. According to Garcia, she and Lopez were in a relationship and lived in the same house, though they slept in separate bedrooms. On the morning after the murder, Lopez called Garcia into his bedroom and confessed to killing Applegate.

{¶ 5} According to Garcia, Lopez told her that he had been at a local bar the night before and that he and the woman he killed got into an argument. Lopez told Garcia that he waited for the woman to leave the bar, and when she exited and was about to enter her car, he asked her to get out and follow him. Lopez told Garcia that he and Applegate "went for a walk" and that when she asked where they were going, he said, "Walk." At that time, Applegate asked Lopez if he "wanted some ass" to which he responded, "Yes I want some ass" and then told her to get undressed.

{¶ 6} Garcia told police that after Lopez told Applegate to undress, she walked away. At that point, Lopez cocked his gun and told Applegate to come back and then "he pushed her and he got on top of her." Garcia went on to explain that after Applegate struggled with Lopez, he shot her in the head. When Garcia

asked Lopez why he had shot Applegate, Lopez responded, "That's what the whores deserve."

{¶ 7} After speaking with Garcia, Smith applied for and was granted a warrant to search Lopez's home. Hamilton police arrested Lopez on an unrelated and minor outstanding bench warrant, and once he was in custody, Smith and other officers executed the search warrant. As a result of the search, police found the weapon used to murder Applegate, along with ammunition and a spent shell casing, as well as the clothes and shoes that Lopez was wearing at the time of the murder.

{¶ 8} After Lopez signed cards indicating that he had been advised of his *Miranda* rights in both English and Spanish, Smith interviewed Lopez, with Officer Taylor acting as a translator. At the beginning of his statement, Lopez acknowledged that he knew the victim, but denied having any participation in her murder. After Smith and Taylor discussed some of the evidence taken from Lopez's house, he changed his story and said that he may have been involved because he did see the "bloody gun" in his house, but that he did not remember what happened.

{¶ 9} However, as Lopez continued to talk, he told Smith that he knew Applegate from his past, claiming that they had once lived together, and that he had intended to have sex with her that night. Lopez then told Smith that when he went to remove his pants, the gun fell out of his waist band, and he grabbed it, and when he went to give Applegate a hug, the gun accidentally went off.

{¶ 10} According to his third version of events, the one ultimately transcribed by Smith and signed by Lopez, Lopez claimed that he had spent the evening at a bar where he had gotten into a fight with the barmaid because she refused to serve him more alcohol. After the fight, Lopez went to a different bar and left after the bar closed for the night. Lopez spotted Applegate at a taxi station, where she expressed her desire to come home with him. After he refused to take her home, Lopez claimed that Applegate removed her shirt and hit him with it. Lopez then walked towards the alley, and Applegate followed him.

{¶ 11} Lopez claimed that as Applegate followed him, she continued to attack him and somehow managed to unbuckle his belt in the process. As Lopez's pants began to fall, he reached for his gun, and Applegate pushed him to the ground, at which time she removed her pants and panties and "came at" Lopez. As the two struggled on the ground, Lopez claimed that he had the gun in his right hand and at one point pulled Applegate on top of him and then turned her towards the ground and got on top of her, causing her legs to open and wrap themselves around his legs. During the struggle, Lopez was able to put the gun directly against Applegate's head and pull the trigger. After rising and pulling up his pants, Lopez went home and went to bed.

{¶ 12} Upon awakening the next morning, Lopez saw the gun on his rug and that there was blood in and on the barrel, and called Lucy Garcia into his bedroom to discuss the previous night's events. Lopez then recalled Garcia asking him why he had killed Applegate and that he had responded, "Because these women want to entice you and take advantage of you and the whores get what they deserve."

{¶ 13} Soon after making his statement, Lopez was indicted on one count of aggravated murder by which the state charged Lopez with killing Applegate while committing or attempting to commit rape. After a three-day trial, a jury found Lopez guilty of aggravated murder and the accompanying firearm specification. The trial court sentenced Lopez to 30 years to life and an additional three years for the specification. Lopez appeals his conviction and sentence, raising the following assignments of error:

{¶ 14} Assignment of Error No. 1:

{¶ 15} "The trial court erred to the prejudice of defendant-appellant when it permitted testimony regarding habits of prostitutes."

{¶ 16} In his first assignment of error, Lopez claims that the trial court erred by admitting portions of Detective Smith's testimony specific to common practices of prostitutes. This argument lacks merit.

{¶ 17} During the second day of trial, the jury heard testimony regarding Detective Smith's investigation into Applegate's murder. Specifically, Smith stated that Applegate was a known prostitute in Hamilton and that prostitution was very common in the area where her body was discovered. Smith then explained to the jury that he often used prostitutes as informants because of information they may gather as a result of the unsavory encounters inherent in their trade. Smith then testified that while he was aware that Applegate was a known prostitute, he had not relied on Applegate for any information.

{¶ 18} The state began to question Smith regarding the common practices of prostitutes specific to their willingness to strip naked in an alley. Although Lopez objected to the state's line of questioning, the trial court overruled the objection, and Smith testified that prostitutes were not willing to "get fully naked" in alleyways. The prosecutor then asked how Smith reached such a conclusion, and before he could answer, Lopez objected again. During a sidebar, Lopez argued that Smith should not be permitted to testify on common practices of the "soliciting world" because Smith had no direct knowledge that Applegate followed those practices. Lopez also argued that Smith's answer was based on pure speculation and was therefore inadmissible. The trial court again overruled the objection, but was silent as to its reasoning for admitting the testimony.

{¶ 19} Smith went on to testify that according to his experience and his knowledge of the "unwritten rules" of prostitution, a "street-wise" prostitute would not agree to complete nakedness in an alley because being unclothed would make her too vulnerable. Smith also testified that prostitutes would be aware that police frequently patrol areas such as alleyways, especially in high-crime locales. Additionally, Smith testified that prostitutes would also shy away from transacting business in a public place, such as an alleyway, where they know others pass through on a regular basis. Smith also stated that prostitutes would know that alleyways are likely to contain vehicle traffic, or can be hotspots for disreputable interactions often including drug users or unsupervised juveniles.

{¶ 20} Lopez now argues on appeal that Smith's testimony was inadmissible and that the trial court erred in permitting Smith to offer his opinion regarding the likelihood of a prostitute's unwillingness to voluntarily disrobe in an alley. While the trial court was silent as to its reasoning for permitting the testimony, we find no error in its conclusion.

{¶ 21} We begin our analysis by recognizing that before a trial court's decision regarding evidence will be disturbed, the appellant must show that the trial court abused its discretion by deciding to admit or exclude the evidence and that the appellant was materially prejudiced thereby. *State v. Martin* (1985), 19 Ohio St.3d 122, 19 OBR 330, 483 N.E.2d 1157. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 181.

{¶ 22} Because the trial court did not make a threshold decision regarding Smith's expert status, we will assume first that his testimony was admitted as a lay witness. According to Evid.R. 701, "if the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 23} Based on these factors, the trial court did not abuse its discretion in permitting Smith to testify regarding the common practices of prostitutes. First, Smith offered his opinion or inferences that were rationally based on his perception. Before Smith offered his testimony, Smith explained to the jury that he has been a police officer with Hamilton for 17 years, with the past eight years spent as a detective. During those 17 years, Smith developed contacts with multiple prostitutes and often turned to them for information, so he was familiar with their practices and unwritten rules. Secondly, Smith's opinion and any inferences regarding the common practice of prostitutes were helpful to a clear understanding of his testimony that prostitutes are highly unlikely to voluntarily

remove their clothing in an alley. Therefore, the trial court did not abuse its discretion by allowing Smith's testimony as a lay witness.

{¶ 24} While Smith's statements were proper lay testimony, the state argues that the trial court permitted Smith to testify as an expert, and Lopez's brief cites case law specific to the boundaries of expert testimony. Therefore, we will assume arguendo that the trial court admitted Smith's testimony as an expert. According to Evid.R. 702, "a witness may testify as an expert if all of the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

{¶ 25} Based on these factors, the trial court did not err if it permitted Smith to testify as an expert on the common practices of prostitutes. First, Smith's testimony related to matters beyond the knowledge or experience possessed by lay persons and dispelled possible misconceptions common among lay persons regarding the regular practices of prostitutes. Given the subject matter of Smith's testimony, it is not unreasonable to assume that the jury would be unfamiliar with the unwritten rules of solicitation. Specifically, the jury would be unfamiliar with the logistics of a high-crime area and the particular vulnerabilities a prostitute would face by disrobing in a well-patrolled alleyway.

{¶ 26} Secondly, Smith is qualified as an expert on the common practices of prostitutes, given his specialized knowledge, education, and experience working with them for many years. As already discussed, Smith's career in law enforcement spans 17 years. Smith testified regarding his schooling, specialized training, and continuing education in law enforcement. Smith also explained that throughout his 17 years of experience, he has had constant contact with prostitutes in the Hamilton area and has worked with prostitutes as informants. In developing this knowledge, Smith testified that he "kept tabs" on Hamilton prostitutes and knew who the prostitutes were, where they worked, and whether they were willing to work with him as informants.

{¶ 27} Lastly, Smith's testimony is based on reliable specialized information. Given his vast experience of working with and relying on prostitutes for assistance, Smith would have information regarding their common practices that would be well founded. By "keeping tabs" on and working within Hamilton's solicitation world, Smith would have a proper base of specialized information on which to base his testimony.

{¶ 28} Because Smith's testimony was admissible as either a lay witness or an expert, the trial court's decision to permit his testimony regarding the common

practices of prostitutes was not an abuse of discretion. Lopez's first assignment of error is overruled.

{¶ 29} Assignment of Error No. 2:

{¶ 30} "There was insufficient evidence to convict appellant of attempted rape committed while in the commission of a murder."

{¶ 31} In his second assignment of error, Lopez argues that his conviction for aggravated murder was not supported by sufficient evidence. There is no merit to this argument.

{¶ 32} When reviewing the sufficiency of evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Wilson,* Warren App. No. CA2006–01–007, 2007-Ohio-2298, 2007 WL 1394631. Therefore, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 33} Lopez was convicted of aggravated murder in violation of R.C. 2903.01(B), which states that "no person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * rape." According to Ohio's rape statute, R.C. 2907.02(A)(2), "no person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 34} "In *State v. Heinish* (1990), 50 Ohio St.3d 231, 238–239, 553 N.E.2d 1026, the Court held that attempted rape requires that the actor intend to compel the victim to submit to sexual conduct by force or threat and commit some act that 'convincingly demonstrates' such intent. The conduct complained of need not be the last proximate act prior to the commission of the felony. Rather, the actor need only take a substantial step, or act strongly corroborative of the actor's criminal purpose." (Citations omitted.) *State v. Fuller,* Butler App. Nos. CA2000–11–217, CA2001–03–048, and CA2001–03–061, 2002-Ohio-4110, 2002 WL 1832858, ¶ 23.

{¶ 35} While Lopez readily admitted that he murdered Applegate, his defense at trial was that he did not rape or attempt to rape her. However, the state presented testimony and evidence from which the jury could have found the essential elements of rape or attempted rape proven beyond a reasonable doubt.

{¶ 36} The state presented DNA evidence placing Lopez's bodily fluids on Applegate's breast. As part of the investigation, police swabbed various parts of

Applegate's body, hoping to find DNA evidence. The swab of her breast and nipple area tested positive for amylase, a chemical component found in saliva as well as other bodily fluids.[1] When comparing Lopez's sample against the DNA found on Applegate, the chances of another test confirming a match other than Lopez was one in 2,288,000,000,000,000,000 (two quintillion 288 quadrillion).

{¶ 37} In supporting his contention that he did not rape Applegate, Lopez asserted that any sexual contact was voluntary. Although he reiterated time and again that Applegate had been a prostitute known for exchanging sexual favors for payment, the prosecution presented evidence from which the jury was free to infer that she was not transacting business in the moments preceding her death.

{¶ 38} Detective Jim Smith testified that according to the custom and practices of street-wise prostitutes, prostitutes would not voluntarily strip naked, knowing that the alley was a public thoroughfare and otherwise well traveled by the police, given its location in a high-crime area. Based on this testimony, the jury was free to infer that Applegate, a well-known prostitute, would also refuse to make herself vulnerable by removing all of her clothing in the alley. The jury could therefore reasonably infer that Lopez had ordered Applegate to remove her clothing or that he removed it himself. See *State v. Powell* (1990), 49 Ohio St.3d 255, 552 N.E.2d 191, superseded by constitutional amendment on other grounds (ordering a victim to take off her clothes strongly corroborates a perpetrator's criminal purpose to engage in sexual conduct and is thus a substantial step towards rape).

{¶ 39} The jury also heard evidence that when Applegate was arrested hours before her death, she had $2.57 in cash on her person. When police inventoried Applegate's possessions as part of her murder investigation, they found only $2.57 in cash in her pants. Therefore, the jury could easily infer that Lopez had not paid for any sexual transaction.

{¶ 40} Beyond drawing the reasonable inference that the sexual contact was not the result of solicitation, the jury heard testimony from which it could infer that Lopez used force in order to engage in sexual conduct with Applegate. The jury heard evidence that Applegate's autopsy revealed two large contusions on Applegate's scalp that were otherwise undetectable from the outside. The doctor who performed the autopsy, Russell Uptegrove, testified that while there was no way to pinpoint the exact time the bruising occurred or by what means it was inflicted, it was possible that the bruising occurred the night Applegate died and may have been the result of a struggle in the alley. The jury could therefore

---

1. According to the DNA analyst's testimony, amylase is 10 times more concentrated in saliva than in sweat.

reasonably infer that the contusions on Applegate's head were caused by Lopez in his attempts to engage in sexual contact.

{¶ 41} The jury also heard testimony that Lopez admitted to police that he was carrying a gun and that his intention the night he killed Applegate was to have sex with her. Lucy Garcia testified that Lopez admitted killing Applegate and that before he shot her in the head, he told her to follow him into the alley and to remove her clothes. Garcia also testified that when Applegate tried to walk away, Lopez cocked his gun and told her to come back, pushed her to the ground, and got on top of her. See *State v. Gipson* (Apr. 6, 1998), Warren App. No. CA97–07–080, 1998 WL 166476 (finding sufficient force where appellant threatened victim with a gun before he sexually assaulted her).

{¶ 42} Considering the evidence in the light most favorable to the prosecution, a reasonable jury could have found the elements of rape or attempted rape proven beyond a reasonable doubt. Therefore, appellant's second assignment of error is overruled.

{¶ 43} Assignment of Error No. 3:

{¶ 44} "The trial court erred to the prejudice of defendant when it permitted hearsay testimony regarding laboratory analyses."

■ {¶ 45} In his third assignment of error, Lopez asserts that the trial court violated his right to confront witnesses against him by admitting laboratory analysis though the testimony of an analyst who did not perform the initial tests on Lopez's samples. We disagree.

{¶ 46} Recently, the United States Supreme Court revisited its Confrontation Clause jurisprudence in *Melendez–Diaz v. Massachusetts* (2009), —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314. Therein, the court held that admitting a sworn affidavit describing the results of laboratory testing, in lieu of having in-court testimony subject to cross-examination, is a violation of the Sixth Amendment's guarantee that an "accused shall enjoy the right * * * to be confronted with the witnesses against him." Based on that decision, the court vacated and remanded *State v. Crager,* 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, in which the Ohio Supreme Court had held that DNA reports are not testimonial as the term is defined in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 47} Days after the court decided *Melendez–Diaz,* Lopez filed a supplemental brief to this court, asserting that his confrontation right was violated because he had not been permitted to cross-examine the analysts who performed the DNA tests on evidence collected during Applegate's murder investigation. At Lopez's trial, the two analysts who originally performed DNA testing on the gun used to kill Applegate and the swabs taken from her body were unavailable to testify

because of training in another state and emergency surgery. Therefore, the state called Travis Worst, a forensic scientist with the Bureau of Criminal Identification and Investigation ("BCI") to testify regarding the results of the DNA testing.

{¶ 48} During his testimony, Worst explained that while he was not the analyst who had tested the blood and swab samples, he had performed a technical review of the examinations that were performed on each piece of evidence.[2] Worst went into great detail regarding the process of peer review and how fellow analysts examine the procedures performed during the original testing to verify the analyst's work and to ensure that proper protocol was followed.

{¶ 49} Specifically, when asked to explain to the jury the way a technical review is performed, Worst stated that he would "essentially open the case file, see the terms of the testing, see what evidence [had been] tested, see if the testing was correct, check the reagents, check [the] chain of custody." He added, "Essentially, I treat the case as my own* * *." Worst then testified that he found no error in the testing and that he had come to the same conclusions as the analysts who had originally tested the samples. According to those results, as confirmed by Worst in his testimony, Applegate's blood was found in and on Lopez's gun, and Lopez's DNA was found on the swab taken from Applegate's breast.

{¶ 50} Lopez now asserts that based on *Melendez–Diaz*, Worst should not have been permitted to testify because he was not the analyst who performed the original tests on his gun and the swab of Applegate's breast. We begin our analysis by briefly reviewing *Melendez–Diaz* and its impact on the Sixth Amendment.

{¶ 51} Melendez–Diaz had been convicted of distributing and trafficking cocaine after a police investigation and search revealed that he possessed between 14 and 28 grams of cocaine. During his trial, the trial court admitted " 'certificates of analysis' showing the results of the forensic analysis performed on the seized substances. The certificates reported the weight of the seized bags and stated that the bags 'have been examined with the following results: The

---

2. While Lopez argues that his rights were violated because Worst was not the technical reviewer of a biology sample tested by an unavailable analyst, a review of the record indicates that Worst reviewed the file, had performed the same type of testing before, was familiar with the testing of biological samples, and that he had reviewed the procedures used by the original analyst. Immediately following his explanation of the way he performs technical reviews, Worst stated that he reviewed the biological testing and found no disputes between the analyst's conclusions and his own. While the biology sample may have gone through a prior technical review under a different analyst, Worst's testimony demonstrates that he too performed a thorough review of the testing and was therefore able to discuss any imperfections or failure to follow proper protocol that may have tainted the testing.

substance was found to contain cocaine.' The certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health as required under Massachusetts law." *Melendez–Diaz,* —— U.S. ——, 129 S.Ct. at 2531, 174 L.Ed.2d 314.

{¶ 52} Massachusetts argued that the trial court did not err in permitting the affidavit in lieu of live testimony because the scientific reports underlying the affidavit were permissible under *Crawford* because the scientific reports were nontestimonial. *Crawford* sets forth the proposition that an accused must be afforded the opportunity to confront the witnesses who "bear testimony" against him. Based on *Crawford, Melendez–Diaz* considered whether the sworn affidavits were considered testimonial, and in finding that they were, reversed Melendez–Diaz's conviction because he had not been afforded the right to cross-examine the analyst who had submitted the affidavit summarizing the test results.

{¶ 53} Before *Melendez–Diaz* was decided, many courts, including the Massachusetts Supreme Judicial Court and the Ohio Supreme Court, categorized scientific reports as records created in the regular course of business. The majority of states had held that the admission of scientific reports was not a violation of the Confrontation Clause because the reports were business records and had not been created for use in future criminal trials.

{¶ 54} However, *Melendez–Diaz* found that the reports were testimonial in nature because they were created to aid the prosecution's case and "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 2531, quoting *Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354, 158 L.Ed.2d 177. In drawing a distinction between scientific reports and business records, the court stated, "[B]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 2539–2540.

{¶ 55} At the time the court was considering *Melendez–Diaz,* Ohio's *Crager* case was also accepted for review. However, based upon its holding that the submission of affidavits regarding scientific testing absent in-court testimony violates a defendant's right to confront the witnesses against him, the court vacated *Crager* and remanded, directing the Ohio Supreme Court to reconsider Crager's conviction based on the *Melendez–Diaz* holding.

{¶ 56} While Lopez now claims that this vacation and remand confirm his argument that his confrontation rights were violated, a closer comparison of *Melendez–Diaz, Crager,* and the case at bar reveals otherwise.

{¶ 57} At first blush, *Crager* seems similar to the case at bar. *Crager* was convicted of aggravated murder after the jury heard testimony from a BCI analyst that Crager's DNA was found at the victim's residence and that blood on Crager's clothing matched that of the victim's. As in Lopez's trial, the analyst who actually performed the tests was unavailable to testify at trial, and the state called a different BCI employee to testify to the tests' accuracy and results. On appeal, the court held that "a criminal defendant's constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing." *Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, ¶ 79.

{¶ 58} Given these facts, we understand why Lopez argues that the Supreme Court's vacation of *Crager* affects his case. However, a closer reading of *Crager*, and a subsequent application of *Melendez–Diaz*, reveal that the case at bar is distinguishable from the Supreme Court's holding in *Melendez–Diaz* and its decision to vacate and remand *Crager*.

{¶ 59} The court specifically stated that its purpose in deciding *Crager* was "to examine issues concerning the extent that the admission into evidence of records of scientific tests (such as DNA reports) in a criminal trial implicates the Confrontation Clause of the Sixth Amendment to the United States Constitution," *Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, at ¶ 1. Stated more specifically, the court accepted *Crager* for review because the Third District Court of Appeals certified a conflict and posed the following question to the court: "[A]re records of scientific tests, conducted by a government agency at the request of the state for the specific purpose of being used as evidence in the criminal prosecution of a specific individual 'testimonial' under *Crawford v. Washington*?" Id. at ¶ 34.

{¶ 60} In answering the question in the negative, the court determined that records of scientific testing are not testimonial in nature and therefore do not run afoul of the Confrontation Clause. Before it began its analysis of the admissibility of a different analyst's testimony in lieu of the analyst who actually performed the test, the court stated its universal supposition of scientific testing's impact on the Sixth Amendment. "The starting point for our analysis is that the DNA reports admitted into evidence in this case were 'business records' under the hearsay exception of Evid.R. 803(6)." *Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, at ¶ 38. The court also based its analysis on its conclusion that the DNA reports offered against Crager were nontestimonial and that "when DNA reports are properly determined to be nontestimonial, it necessarily follows that Crager's Sixth Amendment Confrontation Clause rights were not violated." Id. at ¶ 72.

{¶ 61} As *Melendez–Diaz* invalidated the principles at the core of the Ohio Supreme Court's analysis, a vacation of the entire decision is understandable. However, nothing in the Supreme Court's decision in *Melendez–Diaz* speaks specifically to the admissibility of a second analyst's testimony or whether the Sixth Amendment requires testimony from the analyst who performed the original test. While we are left to decide this very particular question in light of the court's holding in *Melendez–Diaz,* dicta found in the decision is helpful to our analysis.

{¶ 62} The dissent in *Melendez–Diaz* sets forth the proposition that major delays will result by requiring live testimony from all those involved in testing and evaluating evidence against a defendant. After posing the question of what an "analyst" is under the majority opinion, the dissent discusses a scenario in which one person prepares and tests a sample, a second person interprets the print-out of the test, a third calibrates the machine used to test the sample, and yet a fourth certifies that the tester followed established procedures.

{¶ 63} The dissent answers its rhetorical question by stating, "It is not at all evident which of these four persons is the analyst to be confronted under the rule the Court announces today. * * * It is possible to read the Court's opinion, however, to say that all four must testify. Each one has contributed to the test's results and has, at least in some respects, made a representation about the test." *Melendez–Diaz,* —— U.S. ——, 129 S.Ct. at 2544–2545, 174 L.Ed.2d 314 (Kennedy, J., dissenting).

{¶ 64} In response, the majority states, "[C]ontrary to the dissent's suggestion we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that '[it] is the obligation of the prosecution to establish the chain of custody,' this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, 'gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility.' It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live." (Emphasis sic and citations omitted.) Id. at 2532, fn. 1.

{¶ 65} We also note that while five justices ultimately voted to reverse Melendez–Diaz's conviction and find that the affidavits were testimonial in nature, Justice Thomas wrote separately to specifically state his reason for doing so. "I continue to adhere to my position that 'the Confrontation Clause' is implicated by *extrajudicial statements* only insofar as they are contained in formalized testimo-

nial materials, such as affidavits, depositions, prior testimony, or confessions." (Emphasis added.) Id. at 2543 (Thomas J., concurring).

{¶ 66} From this guidance, other courts have held that a defendant's confrontation rights are not violated when the state calls a witness other than the analyst who performed the original test. Recently the Indiana Supreme Court considered *Pendergrass v. State* (Ind.2009), 913 N.E.2d 703, in which Pendergrass challenged his conviction for child molestation. At trial, the state introduced evidence that Pendergrass had impregnated his 13–year–old daughter, who later had an abortion. Specifically, the state submitted DNA tests performed on the aborted baby that confirmed Pendergrass's paternity. Pendergrass claimed that his confrontation rights were violated because the DNA evidence was admitted through the testimony of an analyst who had not performed the original tests.

{¶ 67} However, in affirming Pendergrass's conviction, the Indiana Supreme Court applied *Melendez–Diaz* and concluded that calling a supervisor to testify to results, rather than the analyst who performed the test, was proper because the supervisor "who took the stand did have a direct part in the process by personally checking [the] test results. As such, she could testify as to the accuracy of the tests as well as standard operating procedure of the laboratory and whether [the analyst] diverged from these procedures. * * * Thus, Pendergrass had the opportunity to confront at trial * * * witnesses who were directly involved in the substantive analysis, unlike Melendez–Diaz, who confronted none at all." *Pendergrass*, 913 N.E.2d at 707–708. See also *People v. Johnson* (2009), 394 Ill.App.3d 1027, 333 Ill.Dec. 774, 915 N.E.2d 845 (applying *Melendez–Diaz* to reject appellant's claim that his confrontation right was violated when the state offered DNA evidence through the testimony of an analyst who verified the results of prior testing but who had not performed the original testing); and *Carolina v. State* (2010) 302 Ga.App. 40, 690 S.E.2d 435, 2010 WL 103823, *2 (rejecting appellant's claim that the trial court erred in admitting testimony when "the report or data prepared by the non-testifying technician was not admitted into evidence and the expert who made the determination that the substance was contraband based on her interpretation of the data did testify at trial and was thus subject to cross-examination").

{¶ 68} Similarly, federal courts have also applied *Melendez–Diaz* in a similar fashion. In *Larkin v. Yates* (July 9, 2009), C.D.Cal. No. CV09–2034–DSF (CT), 2009 WL 2049991, Larkin requested habeas relief based partly on Confrontation Clause issues similar to Lopez's. At Larkin's trial, the analyst who performed the original tests on evidence was unavailable, and the state called the lab's supervisor to testify regarding the results. In denying relief, the court considered *Melendez–Diaz,* but distinguished it because the supervisor's testimony regarding the results "was not akin to the affidavit-like certificates of analysis in

*Melendez–Diaz.*" Id. at *1. Instead, the court noted that the supervisor separately reviewed all the relevant data before offering her own independent interpretation rather than simply reading a sworn affidavit into evidence.

{¶ 69} Like these other courts, we find *Melendez–Diaz* distinguishable in that the state did not read a report into the record or offer an affidavit in lieu of live testimony. Instead, the state called Worst to testify regarding the procedures, process, logistics, and results of the DNA testing offered as evidence against Lopez. Through the testimony, the jury was well aware that Worst had not performed the original testing on the samples and could therefore choose to assign whatever weight it chose to the evidence, just as the majority opinion in *Melendez–Diaz* pointed out.

{¶ 70} We also note that in deciding *Melendez–Diaz,* the majority was concerned with the dangers of improper scientific testing. In response to Massachusetts' (and the dissent's) argument that scientific testing is neutral and reliable, the majority noted several studies that reported manipulation of test results and faulty procedures. The majority concluded that therefore, "confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez–Diaz,* —— U.S. ——, 129 S.Ct. at 2537, 174 L.Ed.2d 314.

{¶ 71} Lopez was able to cross-examine Worst and was therefore given the chance to challenge the way the tests were performed and whether the results were reliable. Calling Worst therefore satisfied the majority's stance regarding the ability of confrontation to weed out fraudulent test results. Cross-examining Worst further pointed out the inability of the test to offer dispositive evidence of the alleged rape. Specifically, through the cross-examination, Worst admitted that the testing identified only the match, and not how or when Lopez's amylase had been deposited on Applegate's breast. Lopez also had the opportunity to challenge Worst on his technical review of the testing and the ways in which he formed his independent conclusions on the accuracy of the testing and results. Therefore, and given Lopez's ability to cross-examine the witness against him, having Worst testify rather than the two analysts who performed the original tests did not violate Lopez's right to confrontation.

{¶ 72} Although we are confident in our analysis, we are also cognizant that the Ohio Supreme Court is still to speak on this specific issue. Even if in its reconsideration of *Crager* the court were to find that a violation of Crager's rights had occurred because he did not have the chance to cross-examine the analyst who had performed the original tests, Lopez's conviction would still stand, as any error in permitting Worst's testimony was harmless.

{¶ 73} Lopez readily admitted killing Applegate. He specifically told officers that he was with Applegate the night she was killed and that he had struggled

with her in the alley. His entire defense at trial was that he did not rape or attempt to rape her. Therefore, the DNA evidence in this case does not have the same impact it may have had if Lopez had denied having contact with Applegate or had otherwise refuted the state's accusation that he killed her.

{¶ 74} As discussed under Lopez's second assignment of error, Worst's testimony verified for the jury that Lopez's amylase was found on Applegate's breast. However, through Lopez's cross-examination of Worst, the jury was told specifically that there was no way to verify how Lopez's amylase had been deposited on Applegate's breast. We also note that Lopez never questioned the results of the testing. Instead, during Worst's cross-examination, Lopez's counsel began a question by stating, "[T]hese tests are obviously conclusive to whose amylase that would be * * *." However, the rest of his question and other questions during cross-examination verified that the tests could not determine whether the sample was unquestionably sweat or saliva, or when and how Lopez's amylase had been transferred to Applegate's body. Although it may not have, the jury was free to infer that the sample was sweat transferred during the struggle that Lopez had described in his statement to Lucy Garcia and police officers.

{¶ 75} However, even without the DNA evidence or the existence of amylase on Applegate's breast, in light of Lopez's confession and explanation to Garcia of what had occurred in the moments before he killed Applegate, the jury had ample evidence upon which to base Lopez's conviction. See *State v. Wynn*, Butler App. No. CA2009-04-120, 2009-Ohio-6744, 2009 WL 4896232 (finding harmless error where appellant's conviction was based on other evidence of guilt and where appellant never questioned the tests' results even though the trial court had admitted a lab report absent live testimony based on *Crager's* premise that scientific testing was nontestimonial). Therefore, any error in the admission of Worst's testimony regarding the DNA analysis of evidence used against Lopez was harmless beyond a reasonable doubt.

{¶ 76} Lopez's third assignment of error is overruled.

Judgment affirmed.

BRESSLER, P.J., and RINGLAND, J., concur.